**HILLCREST GOLF AND COUNTRY CLUB, a non-profit corporation, Plaintiff,**

v.

**George PATTERSON, District Director of Internal Revenue for the State of Alabama, Defendant.**

**Civ. A. No. 10156.**

United States District Court
N. D. Alabama, S. D.

May 9, 1963.

Sirote, Permutt, Friend & Friedman and E. M. Friend, Jr., and Harold I. Apolinsky, Birmingham, Ala., of that firm, and Leader, Tenenbaum, Swedlaw & Perrine, and Alfred Swedlaw, Birmingham, Ala., for plaintiff.

Macon L. Weaver, U. S. Atty., and E. Ray Acton, Asst. U. S. Atty., Birmingham, and Louis F. Oberdorfer, Asst.

Atty. Gen., and Edward S. Smith, Myron C. Baum and Gary P. Smith, Attys., Dept. of Justice, Washington, D. C., for defendant.

LYNNE, Chief Judge.

Brought by plaintiff to recover a refund of excise taxes plus interest paid by plaintiff for the last two quarters of 1957 and the four quarters of 1958 in the aggregate sum of $10,195.72, this action was by agreement of the parties submitted for final judgment by the court, without the intervention of a jury, upon the pleadings, the order on pretrial hearing, and the proof, including the stipulation of facts filed herein by the parties on March 4, 1963.

Hillcrest Golf and Country Club (hereinafter, "the Club") is a social club located in Birmingham, Alabama, with a membership in 1957 of approximately two hundred persons. Prior to July 17, 1957, it owned a club house which was badly in need of repairs and the replacement of furnishings. The Board of Governors, the body which operates the Club under policies laid down by the general membership, determined that a new club house was both desirable and necessary provided the expenditure for all purposes would not exceed $300,000.-00. A sharp division existed among the club membership as to what type of construction and expenditures, if any, should be undertaken, especially in view of the severe financial difficulties to which the Club was subjected in the late 1930's and early 1940's.

It was the opinion of the Board of Governors, based upon a thorough discussion of the subject at a series of Board meetings, that no assessment could be passed either by the Board or the general membership unless the membership was assured that the club house, furnishings and necessary incidentals could be obtained for a total cost not to exceed $300,000.00. Further, it was mutually understood by Board and members that if the necessary construction and furnishings could not be accomplished within the ceiling figure, any sums paid by the members pursuant to an assessment would be refunded to them. On July 17, 1957, the general membership adopted a resolution, fully reproduced in the margin,[1] to proceed with the construction of

I. 1957 NEW CLUB HOUSE ASSESSMENT

BE IT RESOLVED that the Hillcrest Golf and Country Club does hereby assess its members for the construction of a new club house upon the present property as follows:

1. $1000.00 plus tax per member payable at the rate of not less than $20.00 per month effective upon the first day of the month subsequent to this date. As a part of this assessment and as a condition of continued membership in the Club, each member not paying his assessment within 30 days shall sign a pledge card upon the form prescribed by the Board. Junior members shall be permitted a deferment of one-half the assessment until their attaining Senior membership, thereafter the remaining portion of the assessment shall be payable in equal monthly installments over a period of 3 years. If during the period when the assessment is payable any member dies or is transferred from the City and resigns from the Club, the balance remaining due upon his pledge shall be forgiven.

2. $50.00 plus tax per year for 5 years for each associate and special associate member.

3. Authorization to the Board of Governors to borrow up to $100,000.00 upon such terms as they approve, said sum to be used in the construction of the new club house. An increase of $5.00 per month (tax included) for Senior members and $2.50 per month (tax included) for Junior members, all to be deposited in a special sinking fund to pay off the money borrowed under the authority of this paragraph.

4. This assessment is upon the condition that the entire cost of said new clubhouse and furnishings (exclusive of interest and tax) shall not be more than $300,000.00.

5. Certificates of Membership in an amount not to exceed $1000.00 for each Senior member and $500.00 for each Junior member shall be is-

the new club house at a cost, which would include all expenses incident thereto, of not more than $300,000.00. The membership understood that the assessment as approved was conditional in the sense that any funds paid pursuant thereto would be refunded to the members if the conditions relative to the overall cost could not be accomplished. In the absence of this understanding the membership would not have passed the resolution requiring such assessment. At this meeting, and for approximately a month prior thereto, Mr. Lawrence Whitten, an architect, had furnished drawings of a proposed new club house, which were posted in the lobby of the existing facility. The Board understood that the new club house had to have a capacity for at least two hundred fifty members, and would approximate the appearance, general design and decor disclosed by such drawings.

Shortly after the meeting, the president of the Club appointed many subcommittees to work with the general building committee in connection with overall planning. These committees were composed of members and their wives. The work of the committees proceeded as promptly as possible considering all the circumstances, but many months passed before the committees were able to make any final recommendations. It was neither ascertained nor reasonably ascertainable that the new construction, furnishings, and incidental expenses could be completed at a cost not exceeding $300,000.00 until February 11, 1959.

The understanding of the Board and the general membership as to such assessment was reiterated by the president of the Club at a special meeting of the general membership held April 9, 1958. In reply to a question as to what would happen to the funds which were paid towards the assessment in the event it was determined that the necessary construction and furnishing of the Club could not be accomplished within the

$300,000.00 limitation, the minutes reflect the following:

"It was stated by the President, in reply to a question, that in the event a new building is not built, that all funds collected therefor would be held in trust and not expended until the club membership directs what is to be done with such funds."

On September 4, 1958, all members of the Club were notified of a proposed merger of that organization with a similar social club. Included in the correspondence sent to these members in advance of the meeting, which was called to determine whether the proposed merger would be consummated, was the following section of the proposed merger resolution under Paragraph 3:

"3. That the building assessment heretofore made by Hillcrest against its members be cancelled and all assessment funds held in trust be refunded to its members."

Merger efforts were subsequently abandoned.

All funds collected pursuant to the assessment were placed in a special savings account in the First National Bank of Birmingham, whereas the general operating checking account of the Club during the period involved herein was maintained at the Steiner Brothers Bank in Birmingham. Such savings account was designated "Hillcrest New Building Fund" and payment of funds therefrom was authorized upon the signatures of two of the three members of the Club whose names appear on the signature card. No payments of any kind were made from this special savings account until after January 1, 1959, nor was any construction in connection with the new club house in fact undertaken prior to that time.

The assessment voted at the July 17, 1957, meeting required as a condition to continued membership in the Club that each member not paying his assessment

sued by the Club to cover the amount of this assessment actually

paid by each member, taxes excluded.

within thirty days could sign a pledge card for the amount of such assessment. In addition, the Board of Governors, at a meeting held on September 4, 1957, approved a resolution requiring that a registered letter be sent on or before September 10, 1957, to each member who had not signed a pledge card advising him that his name would be posted on the bulletin board by a specified date and that he would be dropped from membership in the Club unless a signed card was received by a designated later date. This resolution was designed to encourage the signing of pledge cards. However, the name of no member was posted nor was any member expelled for his failure to sign a pledge card or pay his assessment, either prior or subsequent to the assessment becoming final in February, 1959.

The references in the July 17, 1957, resolution imposing the assessment relative to the ceiling of $300,000.00 of overall cost were material, genuine and bona fide. They were arrived at as a matter of practical expediency and without any thought or consideration of the tax consequences involved.

The essence of plaintiff's contention is that the tax imposed by Section 4241 of the Revenue Act of 1954, 26 U.S.C.A. § 4241, did not apply to capital improvement assessments paid by its members prior to January 1, 1959, on the ground that such payments are exempt under Section 4243(b), added thereto by the Excise Tax Technical Changes Act of 1958, P.L. 85–859, 26 U.S.C., 1958 ed. § 4243(b), the effective date of which was expressly made January 1, 1959.

██ Relying ·upon a Revenue Ruling that the club dues tax on initiation fees, imposed by Section 4241 of the Internal Revenue Code of 1954, does not apply to amounts deposited in escrow by subscribers to a club until such time as the escrow is terminated and the funds are transferred to the club, Rev.Rul. 58–272, 1958–1 Cum.Bull. 435, plaintiff insists that under the facts of this case, as found by the court, the deposit in the special savings account of all moneys realized from the assessment imposed by the resolution of July 17, 1957, in the alternative, constituted a delivery of such funds in escrow or created a trust therein with the result that such assessments must be deemed to have been paid after January 1, 1959, and more specifically on December 1, 1959, when they were actually withdrawn and applied to the cost of improvements and the savings account closed.

That such reliance is misplaced may be demonstrated, in part at least, by the caveat which compares the ruling relied upon herein with a previous ruling, S.M. 1781, III–1 Cum.Bull. 459 (1924), which holds that the tax applies at the time amounts are deposited into a special fund which is administered by the club. While in derogation of the common-law meaning of the term, it has been held that money deposited to be held until the performance of a condition may be treated as deposited in escrow, American Service Co. v. Henderson, 120 F.2d 525, 135, A.L.R. 1414 (4th Cir. 1941), 30 C.J.S. Escrows § 4, p. 1194, it is the generally accepted view that to qualify as an "escrow" there must be a written instrument deposited with a stranger or third person to be held for delivery to the grantee or obligee on the performance of a condition or the happening of a certain event. Baltimore Trust Co. v. Interocean Oil Co., 26 F.Supp. 817 (D.C.Md.1939). Accord: Shelby v. Tardy, 84 Ala. 327, 4 So. 276, and Cherry v. Herring, 83. Ala. 458, 3 So. 667.

██ In a sense the depositary of money under an escrow agreement is a trustee. In the opinion of the court, it profits plaintiff nothing to label the deposit in a special savings account as a trust. For it is the law of Alabama that for a trust to be valid, the legal title throughout the trust must vest in a trustee, with the power and duty to manage the trust property. Code of Alabama, Title 47, § 145.

In any event, plaintiff is impaled upon the horns of a dilemma for here, unlike the situation obtaining in the revenue ruling upon which plaintiff relies, where prospective members of a social club un-

180

der the terms of a contract between the club and an insurance company, deposited with such insurance company to be held in escrow to the credit of the subscribers until the happening of specified alternative events, in the last two quarters of 1957 and the four quarters of 1958, the assessments were paid directly to plaintiff.

If it is supposed that money derived from the assessments was delivered by plaintiff to the First National Bank in escrow or the legal title thereto vested by plaintiff in the First National Bank as trustee, it must be presupposed that such assessments were first paid to plaintiff by its members. And it is precisely the payment of such fees to the Club which constitutes the incidence of the tax. 26 U.S.C.A. § 4241.

It follows that since the assessments involved herein were paid before January 1, 1959, they do not qualify for the exemption provided by 26 U.S.C. 1958 ed., § 4243(b). Accordingly, judgment will be entered in favor of defendant.