425 So.2d 415 (1982)
FIRST ALABAMA BANK OF MONTGOMERY, N.A.
v.
Charlotte Kyle MARTIN, Kathleen Gerson, Gloria Alleta Parker, and Virginia G. Weldon.
80-853.
Supreme Court of Alabama.
August 20, 1982.
As Modified on Rehearing January 14, 1983.
*417 M.R. Nachman, Jr., R.E. Steiner, III, and Eric G. Bruggink of Steiner, Crum & Baker, Montgomery, for appellant.
Jack Crenshaw and Albert W. Copeland and Richard H. Gill of Copeland, Franco, Screws & Gill, Montgomery, for appellees.
William H. Smith, Gen. Counsel and Michael F. Crotty, Asst. Gen. Counsel, Washington, D.C., for amicus curiae American Bankers Ass'n.
TORBERT, Chief Justice.
This is a class action. The plaintiffs are beneficiaries of approximately 1,250 individual trusts, of which the bank is trustee. As trustee of these individual trusts, the bank invested certain assets comprising the principal of those trusts in participating units of two common trust funds, a bond fund and an equity fund.
After First Alabama purchased and sold certain units and made certain investments that resulted in substantial losses to those funds, the plaintiffs sought a declaration as to the duty of the bank and its liability to account, a declaration that certain investments were imprudent, and affirmative relief requiring the bank to restore to the common trust funds the losses sustained because of the bank's allegedly improper investments.
Prior to the certification of the class, First Alabama took the position that this *418 action would require a full accounting of each of approximately 1,250 individual trusts. The trial court did not agree. After the original appeal to this Court,[1] First Alabama filed a delayed counterclaim, requesting a full accounting of its own acts as the trustee of the individual trusts. The court subsequently struck this counterclaim, without prejudice to First Alabama's right to maintain individual suits for an accounting.
The case then proceeded to trial on the issue of whether the bank was prudent or imprudent in the purchase or sale of thirty specified securities. Over First Alabama's objection, the trial court impaneled an advisory jury pursuant to Rule 39(c), ARCP, to aid the court in its determination of these issues.[2] The testimony was then heard orally by the trial court and the advisory jury. Special interrogatories requiring a "yes" or "no" answer were submitted to the advisory jury and, while it was unable to reach a unanimous verdict, as to the majority of issues it ruled ten to two against First Alabama.
At that time, the trial judge made his own findings of fact and on June 24, 1981, the court entered an order which found that the defendant as trustee of the common bond fund purchased the following debentures: ATICO Mortgage Investors, Barnett Mortgage Trust, Guardian Mortgage Investors, Justice Mortgage Investors, Midland Mortgage Investors, and Security Mortgage Investors. The trial court concluded that the purchase of these securities by the bank as trustee did not measure up to the "prudent man" standard and were, therefore, imprudent. Because it found the purchase of these securities imprudent, the court found it unnecessary to decide whether the sale of these securities also had been imprudent. These securities were Real Estate Investment Trusts (REIT's), as described later in this opinion.
In its order, the court also found that the bank as trustee of the common equity fund purchased stock of the following companies as investments for the common equity fund: American Garden Products; Ames Department Stores; Beverage Canners; CNA Financial; Elixir Industries; First Mortgage Investors; Hav-a-Tampa; Kinney Services; Loomis Corporation; Mortgage Associates; Transamerica Corporation; Universal Oil Products; Wynn Oil Co.; Associated Coca-Cola Bottling Company; Cox Broadcasting; Rust Craft Greeting Cards; and Sealed Power. The trial court concluded that the purchase of these securities by the bank as trustee did not measure up to the "prudent man" standard and were, therefore, imprudent. Because it found the purchases of these securities imprudent, the court found it unnecessary to decide whether the sale of these securities also had been imprudent.
The court also found that the bank as trustee of the common equity fund purchased the following securities: Allied Chemicals; Amfac; Blue Bell; Pabst Brewing Company; and Purolator. The court concluded that the bank's purchases of these securities did meet the "prudent man" standard but that their sale did not. The trial court concluded that both the purchase and the sale of Green Giant stock and Syntex stock were prudent. The court based its conclusions upon the test set out in Birmingham Trust National Bank v. Henley, 371 So.2d 883 (Ala.1979).
On August 19, 1981, the court ruled against First Alabama on all of its special and affirmative defenses, readopted its class action order of June 24, 1981, and ordered First Alabama to pay $1,226,798.00 into the bond fund and $1,426,354.88 into the equity fund. These sums represented the difference between the purchase and *419 sales prices of the six bond fund securities and twenty-two of the equity fund securities. The bank was further ordered to pay interest on these sums.
At trial, the plaintiffs introduced evidence of a "common trust plan" that had been adopted by First Alabama and approved by the Comptroller of the Currency. Testimony showed that the essential investment purpose of the bond fund was to produce income and that the essential investment purposes of the equity fund were the appreciation of equity and production of income. The plan recognized that the valuation of the investments of the common trust funds would vary periodically and it had specific provisions as to how the funds would be valued quarterly to reflect the market value of investments. The evidence showed that the method of valuation was carefully spelled out in that plan, but that First Alabama did not follow that method.

I. Evidence as to Imprudence of Investments in the Equity Fund.
In regard to the equity fund, the court found that the purchase of seventeen of the twenty-four designated equity fund securities had been imprudent. As to these seventeen securities, the court found it unnecessary to decide whether their sale was imprudent but did conclude that the sale of five of the remaining seven securities had been imprudent.
Evidence was introduced showing that in 1973 the board of directors of First Alabama reduced to writing what it considered to be minimum standards of safety. Al Byrne, the vice president and senior trust officer of the bank admitted, however, that these standards were followed prior to 1973 as unwritten guidelines and were generally so followed at the time in which the sales and purchases in question were made. These standards were: (1) A rating of B + or better by the Standard and Poor ratings (S & P) (B + being an average rating and B being a speculative rating); (2) a minimum of 1,500,000 shares of stock in the hands of the public; and (3) annual sales of at least $100 million. Byrne testified that the bank generally invested in companies with at least ten years' experience in business and a record of increased earnings. He stated that the companies would generally be rated by one of the rating services. First Alabama claimed that the bank's minimum standards were primarily designed for individual trusts, rather than common trust funds, yet Byrne stated that when purchases were made for the two common funds, bank policy required that those minimum standards adopted by the bank be followed. Evidence was also presented showing that deviations were permitted from these standards adopted by the board of directors with the approval of the trust investment committee so as to accomplish its goals.
The plaintiffs offered evidence that these standards had not been followed. For example, Associated Coca-Cola, Cox Broadcasting, Rust Craft Greeting Cards and Sealed Power were rated B + but failed to meet the Bank's requirement of one hundred million dollars in annual sales. In addition, the following stocks failed to meet the minimum requirement of a B + rating: American Garden Products; Ames Department Stores; Beverage Canners; CNA Financial; Elixir Industries; First Mortgage Investors; Hav-a-Tampa; Kinney Services; Loomis Corp.; Mortgage Associates; Transamerica Corp.; Universal Oil Products; and Wynn Oil Co.
Dr. Robert Johnston, chairman of the finance faculty of the School of Business of George Mason University and expert witness for the plaintiffs, testified that First Alabama, as trustee, should have invested defensively. According to Johnston, a trustee should first provide for the safety of the principal and then obtain an adequate return. He based his conclusions upon a treatise by Dr. Benjamin Graham, which stated seven criteria for testing the safety of investments. These criteria were (1) a minimum of $100 million in annual sales; (2) a current ratio of at least two to one (current assets should be twice current liabilities); (3) a net working capital to long-term debt ratio of at least one to one (net working capital being current assets less current liabilities and long-term debt meaning obligations *420 that mature in more than one year); (4) earnings stability (positive earnings for the last ten years); (5) a good dividend record; (6) an earnings growth measure of at least one-third per share over a ten-year period, averaging the first three years and the last three years to remove extremes; (7) a moderate price earnings ratio of no more than fifteen to one; and (8) a moderate ratio of price to assets of no more than one and one half to one. Johnston believed that a trustee should not purchase stocks which failed to meet any one of these standards. Applying these standards, Johnston concluded that:
1. The purchase of the Allied Chemicals stock did not meet standards 6 and 7.
2.[*] The purchase of the American Garden Products stock did not meet standards 1, 4, 5, 6, 7, and 8.
3.[*] The first purchase of Ames Department Stores stock failed standards 1, 5, 7, and 8. The second purchase of Ames Department Stores stock failed standards 1, 5, and 8.
4. The first purchase of Amfac stock failed standard 3. The second purchase of Amfac stock failed standards 3 and 7. The third purchase of Amfac stock failed standards 2 and 3.
5.[*] The purchase of Associated Coca-Cola stock failed standards 1, 2, 3, 5, 7, and 8.
6.[*] All four purchases of Beverage Canners stock failed standards 1, 4, 5, 6, 7, and 8.
7. The first purchase of Blue Bell stock failed standard 8. The second purchase of Blue Bell stock passed all eight standards.
8.[*] The purchase of CNA Financial stock failed standards 4, 5, and 6.
9.[*] Both purchases of Cox Broadcasting stock failed standards 1, 3, 5, 7, and 8.
10.[*] All three purchases of Elixir Industries stock failed standards 1, 2, 4, 5, 6, 7, and 8.
11.[*] The purchase of First Mortgage Investors stock failed standards 1, 5, 7, and 8.
12. Both purchases of Green Giant stock satisfied all eight standards.
13.[*] The purchase of Hav-a-Tampa stock passed all eight standards.
14.[*] The Kinney Services securities were convertible preferred securities and should not have been in the equity portfolio.
15.[*] Both purchases of Loomis stock failed standards 1, 3, 4, 5, and 6.
16.[*] The purchase of the Mortgage Associates stock failed standards 1, 4, 5, 6, 7, and 8.
17. The purchase of the Pabst Brewing stock passed all eight standards.
18. The purchase of Purolator stock failed standards 7 and 8.
19.[*] All four purchases of Rust Craft Greeting Cards stock failed standards 1, 2, 7, and 8.
20.[*] The purchase of Sealed Power stock failed standards 2, 3, 7, and 8.
21. The first purchase of Syntex stock failed standards 7 and 8. The second purchase of Syntex stock failed standard 8.
22.[*] The first purchase of Transamerica stock failed standards 6, 7, and 8 with standards 2 and 3 not being applied. The second and third purchases of Transamerica stock failed standard 6 with standards 2 and 3 not being applied.
23.[*] The first purchase of Universal Oil stock failed standards 2, 6, and 7. The second purchase of Universal Oil stock failed standards 2 and 6.
24.[*] The Wynn Oil stock failed standards 1, 4, 5, 6, 7, and 8.
The bank, however, contested Johnston's opinion by testimony from Walter McConnell, an investment banker from New York, who stated that Graham's book was intended for amateurs and not trustees. Also, Johnston on cross-examination was forced to admit that only five of the thirty stocks in the Dow Jones industrial average would meet these criteria. Johnston did not believe that a trustee could protect the principal *421 against inflation by investing in common stocks. However, he did believe buying stocks in an old established company which paid high dividends is better than investing in a new venture.
Walter McConnell, as an expert witness for the bank, listed various criteria to be applied in testing the soundness of an investment. Among these were the stability of the company, its financial soundness, its debt/equity ratio, the quality of its management, the company's product, and its standing in the industry. He testified that those criteria would not be affected by market cycles or ups and downs in the market. He stated that in his opinion the investments were prudent, though he could not say that his company had recommended the purchase of these stocks while he was an adviser.
McConnell testified that he believed a trustee must take inflation into account in making trust investments. He stated that the most popular approach was to invest in the very best companies, i.e., the best "growth" companies. The idea was that with companies whose earnings and dividends were growing faster than inflation one would be protected against inflation. Another approach, according to McConnell, was not as popular but was still used by some large banks. This approach was to buy stocks in companies that were not well known, i.e., not well recognized and which were selling at much lower prices than the stocks of better known companies. McConnell analyzed the twenty-four stocks at issue and concluded they had a faster growing rate than the general market, and their earnings were also growing faster than the general market, but they were selling at a lower price-earnings ratio. He concluded that First Alabama used a rational investment approach and that the purchases of these twenty-four stocks were prudent. He further testified that S & P ratings were not intended to be used as investment recommendations and that experienced analysts do not use S & P ratings as a guide to sound investments. He further testified that it would be imprudent to buy or sell solely because of the S & P ratings, because one would not be using judgment in his decisions. Evidence was also introduced showing that the S & P ratings were issued with a warning that they should not be used solely as market recommendations.
Eldon Davis, a former trust investment officer of the bank, who was the trust investment officer at the time the investments were made, testified for First Alabama by deposition. He stated that in 1971 and 1972 the stock market was very high. The "Favorite 50" stocks were selling at extremely high prices so he decided to seek out securities that were undervalued in relation to the higher priced ones. He further stated that he did not rely on prospectuses, because the SEC requires a prospectus to be "plastered with a high degree of risk," and "will not let you say anything good about the securities," i.e., will not allow a prospectus to make favorable forecasts or projections. He likewise stated that he saw little difference in stocks rated B, or speculative, and B +, or median, since the rating services "just don't understand the business they are in." It was Davis's opinion that it is best to buy securities in the growth cycle of a company and not after it has matured.
First Alabama also introduced evidence from brokers who had made recommendations as to the stocks in question. Yet, Davis stated that at no time were they recommended as "safe" investments. Evidence was also presented that the recommendations were from brokers who had an interest in inducing the purchase of the stock.

II. Evidence as to Imprudence of Purchases in the Bond Fund.
Substantial questions arose in regard to the bond fund concerning the purchase of securities of six real estate investment trusts (REIT's). REIT's are entities primarily engaged in mortgage lending on security of real estate, or in a combination of lending with the ownership and commercial development of real estate. One witness called REIT's "the mutual funds of real estate." In September 1971, First Alabama *422 purchased the unsecured debentures of six REIT's for $2,608,443.00, which comprised 23.2 percent of the principal of the bond fund. First Alabama suffered a 47.03 + % loss on these bonds when they were sold for $1,381,645.00, for a total loss of $1,226,798.00.
Questions were raised as to whether REIT's are safe trust investments. Kenneth Campbell, an expert witness for First Alabama, testified that the purchases of the REIT's were prudent investments. Yet he had called REIT's "shaky legal undertakings" in his book, New Opportunities in Real Estate Trusts 29 (1978).
Testifying for the plaintiffs, Dr. Johnston stated that REIT's were risky investments. He applied a test set out by Benjamin Graham in his book Security Analysis (4th ed. 1962), which included size of the company, ratio of income to fixed charges, ratio of income to fixed charges in the company's worst year, ratio of income to funded debt, value of property ratio, ratio of net assets to funded debt, and a debt to capital funds ratio. Johnston testified that Graham's standards required one to look at the record of an REIT for a period of seven to ten years before making the investment, in order to determine the ratio of income to fixed charges. This was impossible here, however, because all of the REIT's were "too new" to apply this test. Johnston concluded that all six of the REIT's failed to meet the test suggested by Graham. Johnston concluded it was a poor decision to purchase REIT's because there were other options available which were less risky.
The plaintiffs also offered the prospectuses of the REIT's, which contained several pages of risk factors. These risk factors pointed out: (1) That the issuers were mortgage trusts engaged in making highrisk development and construction loans; (2) the competition in that field; (3) the conflict of interest with the sponsor-adviser; and (4) the fact that they operated principally on a leverage basis (that is, borrowing capital to increase earnings). Plaintiffs' evidence showed that the REIT's were making high-risk loans dependent upon the borrower's ability to pay. The plaintiffs contended that if the borrower had good credit, it could borrow directly from the bank and not have to pay the REIT fee.
Campbell, testifying for the bank, stated that the REIT's concept has limited if not dangerous application for mortgage lending trusts. John Davis, hired by First Alabama to replace Eldon Davis as trust investment officer, testified that in his opinion the purchase of the six REIT's was imprudent because they were all leverage. Davis testified that the REIT's would not meet the standards of the Bank today.
Mr. Byrne testified that in 1972 First Alabama's standards for bond purchases were to buy bonds from companies that were well managed, that were generally AA or better, that had the ability to withstand industry trauma, and that were the larger companies available in the bond market. None of the six REIT's met those standards.

III. Special Defenses
The purchase and sale dates of all securities involved were stipulated to have been at least one year prior to the filing of this action on December 27, 1978. The defendant subsequently pleaded six special defenses, which were denied. As to the statute of limitations and laches, the plaintiffs stated that the defendant was still acting as trustee and that defendant showed no evidence that it had been materially harmed by the fact that the action was filed only in 1978.
As to acquiescence and ratification, the defendant offered no evidence to show that the beneficiaries were advised that the bank had made these purchases or that the minimum standards adopted had not been followed. Neither did the bank offer evidence of any change in its position in reliance on anything done by the beneficiaries sufficient to give rise to an estoppel.
The bank produced a box of releases which it claimed absolved it of any liability. The defendants alleged that these releases would excuse First Alabama from any liability for losses caused by imprudent acts. After hearing the evidence presented, the *423 court held that the defendant did not meet its burden of proof to sustain these six defenses and dismissed all of them.
In its final order the court ordered the defendant to take whatever actions should be necessary to place the common trust funds and beneficiaries in the same position they would have occupied had the bank fully performed its duties. As to the lost principal that was unrecovered, the court determined from the evidence that investment in one-year treasury bills would be fair to the parties. As to the income that the common trust funds would have earned without the transactions complained of, the court ordered First Alabama to calculate the accounts as if it had fully performed the duties as the plaintiffs claimed it should have performed, and to recalculate the accounts as if it had promptly reinvested all the additional income at specified one-year treasury bill rates ranging from 4.61% to 13.23% and averaging 7.5%.
The initial issue raised by the appellant is whether the plaintiffs have standing to invoke the jurisdiction of the equity court to supervise the bank as trustee of the common funds. First Alabama contends that the plaintiffs do not have such standing and contends that they have no proprietary interest in the assets of the bond and equity funds, since the bank itself holds legal title to the assets in the common trust funds. This is without merit.
It has long been the law in Alabama that where a trustee does not perform his duty to protect the trust, the beneficiaries may sue in equity to protect their rights. Riley v. Bradley, 252 Ala. 282, 41 So.2d 641 (1948); Ex parte Jonas, 186 Ala. 567, 64 So. 960 (1914). Supervising the administration of trusts is a well-recognized ground of equity, Scott v. Mussafer, 223 Ala. 153, 134 So. 857 (1931), and the regulation and enforcement of trusts is one of the original and inherent powers of the equity court. Silverstein v. First Nat. Bank of Birmingham, 231 Ala. 565, 165 So. 827 (1936).
Appellants also contend that the trial court erred in holding that this was a proper class action under Rule 23(b)(1) and (b)(2), ARCP. First Alabama states that the trial court, by certifying the class under Rule 23(b)(1) and (b)(2), without giving notice to the beneficiaries involved, deprived those beneficiaries of the opportunity to opt-out or to be represented by counsel of their choice, thereby violating the due process guarantees of Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), and Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The appellants further contend that the plaintiffs are seeking primarily money damages and that it was error to allow them to proceed under Rule 23(b)(1) and (b)(2) instead of Rule 23(b)(3). We do not agree.
Neither Eisen nor Mullane dealt with notice under Rule 23(b)(1) or (b)(2). In fact, Rule 23(c) provides that notice is required only in class actions certified under Rule 23(b)(3). Rule 23(b)(1) and (b)(2) class actions have been held not to require notice. Bolton v. Murray Envelope Corp., 553 F.2d 881 (5th Cir.1977); Robinson v. Union Carbide Corp., 544 F.2d 1258 (5th Cir.1977).
We are also unable to agree that this class should have been certified under Rule 23(b)(3). As stated by this Court in the former appeal of this case, "The lower court's rather lengthy certification order... clearly discloses that each of the factors set forth in Rule 23 was carefully considered before the class action determination was made. The order does not reveal any abuse of discretion." First Alabama Bank of Montgomery, N.A. v. Martin, 381 So.2d 32, 35 (Ala.1980). If the trial court applies the correct criteria to the facts of the case, the decision is considered to be within its discretion. Bermudez v. United States Department of Agriculture, 490 F.2d 718 (D.C.Cir.1973). Furthermore, the fact that a Rule 23(b)(1) or (b)(2) suit may ultimately result in a monetary recovery from a defendant does not prevent certification under those subdivisions. Senter v. General Motors Corp., 532 F.2d 511 (5th Cir.), cert. denied, 429 U.S. 870, 97 S.Ct. 182, 50 *424 L.Ed.2d 150 (1976); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.1971). See also, Muzquiz v. City of San Antonio, 378 F.Supp. 949 (W.D.Tex.1974), aff'd, 520 F.2d 993 (5th Cir.1975), judgment vacated and remanded on other grounds, 438 U.S. 901, 98 S.Ct. 3117, 57 L.Ed.2d 1144 (1978), wherein a Rule 23(b)(2) class was certified where an accounting and restitution were sought along with injunctive relief, and Bermudez v. United States Department of Agriculture, 490 F.2d 718 (D.C.Cir.1973), wherein a suit for declaratory relief also sought the payment of benefits pursuant to that declaration under Rule 23(b)(2). We thus hold that the trial court did not err in certifying the class under Rule 23(b)(1) and (b)(2).
First Alabama next argues that the trial court erred in dismissing its counterclaim, which sought an accounting of the 1,250 trusts that participated in the two common funds during the period of time in question. Appellant insists that such a dismissal deprives it of its right as a trustee to ask for an accounting of each trust and thereby deprives it of its property without due process of law. The facts show, however, that First Alabama did not file this counterclaim until after this Court's original decision in this case. Under Rule 13(f), ARCP, leave of court to set up the counterclaim is in the discretion of the trial court and we cannot say that this discretion was abused. Furthermore, under Rule 23(c)(4), the court has the discretion to make necessary orders for the efficient disposition of class actions. The court obviously felt that to allow the counterclaim would make the class unmanageable. It therefore properly dismissed the counterclaim without prejudice, reserving the right in First Alabama to bring individual actions for accounting.
Another issue raised on appeal is whether the trial court erred in dismissing the six special defenses of First Alabama, thus holding that this action was not barred by the statute of limitations or by the principles of laches, acquiescence, ratification, equitable estoppel, or release. We find no error in the trial court's dismissal of these defenses. First Alabama contends that the fact that all purchases and sales of the bond and equity securities occurred more than one year from the filing of the action in 1978 should cause this action to be barred. The appellant contends that the long-standing rule that the statute of limitations does not run in favor of the trustee of an express trust while the trust continues, Benners v. First Nat. Bank of Birmingham, 247 Ala. 74, 22 So.2d 435 (1945), is inapplicable and that the bank should be treated as a constructive trustee. A constructive trust, however, is a creature of equity which operates to prevent unjust enrichment. Such a trust will be found either when property has been acquired by fraud or when, in the absence of fraud, it would not be equitable to allow it to be retained by the constructive trustee. Brothers v. Moore, 349 So.2d 1107 (Ala.1977). In an express trust, legal title to the trust must vest in the trustee, along with the power and duty to manage the trust property. Hillcrest Golf and Country Club v. Paterson, 217 F.Supp. 176 (N.D.Ala.1963), aff'd, 330 F.2d 613 (5th Cir. 1964). First Alabama has already stated that it holds legal title to the assets of the common trust funds. Thus, it is clear that there existed an express trust between First Alabama and the plaintiff class.
Neither do the principles of laches, acquiescence, ratification, or equitable estoppel apply. First Alabama states that the class members received annual reports and quarterly statements that should have given them notice of the sales and purchases and should have led to earlier complaints. Yet the law in Alabama places the burden of proving these affirmative defenses on the party asserting them. Thus, in order for the doctrine of laches to apply, First Alabama was charged with showing that the alleged neglect or omission of the plaintiffs to assert their rights caused prejudice to the defendant. Multer v. Multer, 280 Ala. 458, 195 So.2d 105 (1966). Likewise, for the doctrine of estoppel to apply, the defendant must prove a change in position in reliance upon an act or omission of the other party. Hendricks v. Blake, 291 Ala. *425 575, 285 So.2d 82 (1973). The trial court held, and the evidence showed, that First Alabama did not meet its burden in regard to these defenses.
As to the defenses of acquiescence and ratification, the following rule applies:
"The rule that beneficiaries cannot question the propriety of a trustee's act, omission, or transaction to which they have given their approval or consent is operative only where the trustee has made a full disclosure and the beneficiaries had full knowledge of all the material facts and circumstances, particularly those relating to the risk involved; or ought to have had such knowledge by reason of means and opportunities directly at their command. They must have had knowledge of, and understood, their rights. They must have been aware of the impropriety or breach of trust involved in the act, omission, or transaction which they approved or to which they gave their consent. In some cases, it has been said that the rule is operative only where their knowledge is actual, and it is clear that the rule is not operative by reason of facts of public record which the beneficiaries are under no obligation to search. It has been held that the beneficiaries must not only have been acquainted with the facts, but that they must have been apprised of the law, and of how the facts would be dealt with by a court of equity."
76 Am.Jur.2d Trusts § 337 (1975). There was no evidence shown that First Alabama, as trustee, made full disclosure of its actions. The only information received by the beneficiaries was the annual statements, which showed only the purchase and sale of the investments. No disclosures were made informing the plaintiffs of a failure to follow the standards adopted by the bank's trust department. Thus, we find no error in the trial court's holding that these defenses did not apply.
First Alabama also contends that many of the trusts involved in this litigation were terminated and releases were signed prior to the commencement of this suit, which would have released the bank from liability and would reduce the judgment by $500,000.00. These releases, however, were signed upon termination of the trusts and released the bank from further liability on the individual trust accounts. They did not purport to release First Alabama from liability as trustee of the common funds while it still acted in its capacity as trustee. During the portion of the trial concerning damages, the following occurred:
"MR. CRENSHAW: Your Honor, I understand from Mr. Nachman that there is no claim that any of these Releases undertook to release the Bank as trustee of the common funds.
"MR. NACHMAN: Well, our position is that none of these people were beneficiaries of the common fund. It relates to the trust of which they were beneficiary, and it carries with it our contention of releases against any losses [that] may have been incurred by the individual trust by virtue [of] an investment that he was participating in in the common fund. They are the class members, the beneficiaries of the individual trusts. Of course, this goes back to one of our earlier points as to why they have no standing."
The trial court found that the appellant did not sustain its burden of proof as to this issue, and we agree.
The next issue raised on appeal is whether this Court should apply the ore tenus rule to this action. First Alabama contends that the rule should not apply because not all testimony was taken orally. Again, we do not agree. While there was evidence taken in the form of documents, and while depositions were read into evidence, the trial judge heard a considerable amount of oral testimony. The trial court was placed in the best position to decide the case. It is the law in Alabama that where evidence has been presented orally, a presumption of correctness attends the trial court's conclusion on issues of fact, if these conclusions were based totally or in part on oral testimony. This Court will not disturb *426 the trial court's conclusions unless they are clearly erroneous and against the great weight of the evidence. Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala.1981); Raidt v. Crane, 342 So.2d 358 (Ala.1977); Adams Supply Co. v. United States Fidelity & Guaranty Co., 269 Ala. 171, 111 So.2d 906 (1959). Due to the fact that the court reached its conclusion after hearing oral testimony, we hold that the ore tenus rule is applicable in this case.
The principal issues to be determined on the merits of this case are whether the trial court erred (1) in finding that the bank acted imprudently in buying or selling the securities, and finding First Alabama to have breached its trust, (2) in assessing interest as a surcharge for imprudent investments, and (3) in ordering a distribution of money damages to the members of the class without identification of the recipients or calculation of their exact damages.
The standard to be followed in determining whether a trustee has breached his duty to the trust was stated in Birmingham Trust National Bank v. Henley, 371 So.2d 883 (Ala.1979):
"The general definition of a trustee's investment duties was first stated by the Supreme Court of Massachusetts in Harvard College v. Amory, 9 Pick. 446, 461, 26 Mass. 446, 461 (1830):
"`All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested.'
"The Restatement of the Law of Trusts 2d, § 227 (1959), states the rule in the following language:
"`In making investments of trust funds the trustee is under a duty to the beneficiary
"`(a) in the absence of provisions in the terms of the trust or of a statute otherwise providing, to make such investments and only such investments as a prudent man would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived....'
"...
"BTNB is liable to the Trust in the Birmingham Realty matter only if it breached some duty to the Trust in refusing to make this investment at the time the decision was made. Was it an investment which a prudent man, managing his own affairs, would have made, based upon information then available? Liability cannot be based on the fact it subsequently developed that the investment would have been a good one. This is but the converse of the rule that a trustee is not liable if he makes an investment in a security which subsequently depreciates in value. III Scott on Trusts, § 204, supra, expresses the rule as follows:
"`The failure to make a profit which does not result from a breach of trust does not subject the trustee to liability. Thus if by the terms of the trust he is permitted but is not directed to invest in certain securities, he is not liable for failure to make the investment, although the securities subsequently appreciate in value....'
"The rule has also been summarized by Headley, Trust Investments, [97] Trusts & Estates 739 (1952), as follows:
"`The first and all inclusive requirement of the law is that a trustee shall act with complete and undivided loyalty to his trust. Second is that a trustee shall act prudently in the selection and management of investments. The elements of prudence are:
"`(1) Carea trustee must gather and weigh the facts and base his decisions on them rather than on rumor or guesswork;
"`(2) Skilla trustee must exercise the skill of the average person as a minimum; and if he has more than average skill he must exercise such skill as he has;

*427 "`(3) Cautiona trustee must not take chances which will imperil the accomplishment of the purposes of the trust.
"`...
"`... There must be balance between security of principal and amount and regularity of income; and the governing motive of the trustee must be sound investment for a long period and not speculation for a profit...'
"With specific reference to a trustee's investing in common stocks, this author says:
"`... They represent no promise to return a dollar amount to the investor; their dividends are dependent on earnings and the action of a board of directors; they have always afforded an attractive vehicle for speculation. Nevertheless some of them have demonstrated, over a long period of years, the qualities required for sound permanent investments. Intrinsic values have been maintained and dividends have been adequate and regular. The principal has been reasonably safe for a number of reasons: competent management, sound financing, position in an essential industry, a successful record and an adequate market....'"
371 So.2d at 894-96. Tested by this standard, we cannot say that the trial court committed reversible error in finding that the defendant did not fulfill its duty of caution, to preserve the trust corpus above all else, while striving for a regularity of income.
As to the imprudence of the equity fund, First Alabama contends that since Alabama is a "legal list" state, and since the beneficiaries had given their permission for the bank to invest in items not on the legal list, then the beneficiaries have no complaint for investments that have gone awry. This argument is without merit. As a trustee, First Alabama has a duty to preserve the trust property and make it productive. III Scott on Trusts § 227 (3rd ed. 1967).
First Alabama also contends that the only reason for holding it liable for the losses on the purchase and/or sale of the securities was that the ratings were below B + on the S & P chart, and that the only reason for holding it liable for the losses on the REIT's was that there was no Moody's or similar rating. First Alabama asserts that to hold it liable here on such evidence would impose a duty upon trustees that would make them absolute insurers against a drop in market price. This, however, is not the case. First Alabama cannot be held liable for its failure to meet its own standards. This is only one factor in the decision. The evidence in this case supports the decision of the trial court that First Alabama failed to fulfill its primary responsibility which was to provide for the safety of the trust's principal. The secondary responsibility was to insure an adequate return.
The difference between speculation and investment is well described by Dr. Headley in Headley, Trust Investments, 97 Trusts & Estates 739 (1952), quoted above in the quotation from Birmingham Trust National Bank v. Henley, 371 So.2d at 895. As Dr. Headley states, one who buys common stocks with the idea of selling them on the market for higher prices is speculating. One who is making a prudent investment examines the stocks' intrinsic values and purchases them for a long-term investment. Walter McConnell, testifying for the defendant, stated that one approach adopted by trust managers is to pick established stocks and not worry about subsequent turns in the market price. It is obvious that neither Headley's standards, nor those mentioned by McConnell, were consistently used by First Alabama.
Dr. Robert Johnston, an expert witness for the plaintiffs, also testified as to how a trustee should conduct his investments. Dr. Johnston stated that, in his opinion, trustees should invest defensively and protect the principal. He testified that most of the seventeen stocks later found to be imprudent investments would fail to meet his tests. While Walter McConnell, an expert witness for the bank, stated that he believed the purchases to be prudent, he could not say that he, as an investment adviser for a number of trust companies, had ever *428 recommended the purchase of any of the twenty-four stocks at issue.
Finally, the testimony of Eldon Davis, who made the investments at issue, further strengthens the holding of the trial court. As stated above, Mr. Davis testified that he did not look at prospectuses, that he saw little difference between a stock rated B +, or median, and one rated B, or speculative, that he did not think the rating services understood their business, and that he tried to buy undervalued stocks instead of the higher priced, more established ones. All of this evidence, taken together, supports the holding of the trial court that First Alabama was imprudent with regard to purchases made for the equity fund.
We also find no error in the trial court's holding that the sale of the five stocks was imprudent. Even Eldon Davis testified in his deposition that he was against the sale of these stocks and had recommended that they be held. Mr. McConnell, testifying for First Alabama, stated that during the recovery period after the recession the five stocks all had higher recovery rates than the S & P 500. It seems reasonable to state that had these stocks not been sold at the bottom of the market, there would have been no loss. It is true that a trustee will not be held liable under ordinary circumstances for losses due to unforeseen depression or recession of the stock market. Yet, where the course of dealing of the trustee is such that it causes the loss, a trustee will be liable. First Nat. Bank of Birmingham v. Basham, 238 Ala. 500, 191 So. 873 (1939). Here, First Alabama sold these stocks at or near their lowest price levels, against the advice of its own trust officer, and at the time the country was just beginning to recover from the worst recession since the 1930's. We cannot hold as a matter of law that the trial court erred or was plainly and palpably wrong in its conclusion that a reasonable and prudent man would have held these stocks. We therefore affirm the trial court's decision that the sale of the five stocks was imprudent.
It does appear clear from the evidence before the trial court that the investment in six REIT's for the common bond fund was imprudent. The six REIT's were all three years old or less, they were not listed among the top REIT's in the country, and they were among the weakest of the nation's REIT's. They did not meet the standards of Al Byrne, Robert Johnston, and Kenneth Campbell, all experts in the case. Thus, we hold that the trial court committed no error in holding against First Alabama as to the purchase of the six REIT's.
First Alabama also insists that the trial court erred in ordering the bank to pay interest on the lost principal at a rate equal to one-year treasury bill rates. The defendant says that for it to have invested in treasury bills initially would have been improper, and for it now to be forced to calculate interest as if it had invested in this method will also be improper.
The rate and amount of interest is a matter in the sound discretion of the court to be determined by the circumstances of each case and should, at a minimum, restore to the beneficiaries the income they otherwise would have received. Pennsylvania Co. v. Wilmington Trust Co., 41 Del.Ch. 153, 189 A.2d 679 (1963). By using the treasury bill rate, the court set out a readily determinable specific interest rate to be applied in each year. It is our opinion that the trial court did not abuse its discretion here.
Additionally, First Alabama argues that it was improper for the trial court to compound the interest paid on the lost principal on a quarterly basis. First Alabama cites Gordon v. Brunson, 287 Ala. 535, 253 So.2d 183 (1971), where this Court held that an interest surcharge for breach of trust should be no more than the rate of return that would have been earned had the trustee properly performed his duties and that compound interest would be imposed only where there was an evil or corrupt intent. The defendant states that that case mandates that only simple interest be charged on the judgment. We do not agree.
*429 In Alabama, a court of equity is authorized to mold its decree so as to adjust the equities of the parties and meet the necessities of each situation. Coupounas v. Morad, 380 So.2d 800 (Ala.1980); BBC Investment Co. v. Ginsberg, 280 Ala. 148, 190 So.2d 702 (1966). Where a trustee makes an investment that is improper, it is equitable for the court to put the parties in the position they would have occupied except for the breach of trust. Here, the Bank as trustee of the Common Trust Fund was required to pay income quarterly to the individual trusts. Clearly the Bank as trustee of the individual trusts would have been under a duty to distribute or reinvest the income that should have been received. Since it is clear that such income was not distributed, we hold that the trustee would have been required to reinvest the same. Opinion of the Justices, No. 65, 244 Ala. 456, 13 So.2d 559 (1943). First Alabama argues that Gordon, supra, mandates that only simple interest is due to the beneficiaries absent a finding of evil or corrupt intent on the part of the trustee. While we agree that a situation where the trustee is guilty of evil or corrupt intent is one situation where interest is compounded, it is clearly not the only one.
We find support for this result from several authorities. Scott indicates, "It has also been held that [the trustee] is liable for compound interest where it was his duty to reinvest interest received by him...." A.W. Scott, Law of Trusts § 207.2 (1967). The Restatement 2d of the Law of Trusts also supports this result:
"If the trustee is under a duty to reinvest interest received by him and accumulate it for the beneficiary, and fails to do so, he is chargeable with compound interest, since if he had not committed a breach of trust he would have received compound interest."
Restatement (Second) of Trusts, Comments, § 207 (1959). Since we have held that the trustee would have been required to reinvest the income on the lost principal, it is clear that the trial court's order to compound interest and to make such computations on a quarterly basis is without error.
Finally, the defendant contends that the trial court ordered a distribution of the fund to the class members without identification of the members or their exact loss. This is not the case. The evidence shows the names of the beneficiaries of the 1,250 trusts, all of which names are on file in First Alabama's computer. The order of the trial court sets out in detail how this calculation and distribution are to take place. Thus, we cannot agree with the defendant that the trial court was in error on this point.
After careful consideration of the many issues presented on appeal, this Court has determined that the trial court did not err in finding for the plaintiffs. We reaffirm the "prudent man rule," which states that a trustee must only exercise sound discretion, conduct himself faithfully, and manage funds entrusted to him as men of prudence, discretion, and intelligence would manage their own affairs, having due regard for the safety of the corpus and probable income. Harvard College v. Armory, 26 Mass. (9 Pick.) 446 (1830). See also, Birmingham Trust National Bank v. Henley, 371 So.2d 883 (Ala.1979). We conclude that the trial court applied the "prudent man rule." Based upon the foregoing principles and the ore tenus rule, the findings of the trial court are due to be affirmed.
AFFIRMED.
JONES, SHORES, EMBRY,[**] BEATTY and ADAMS,[**] JJ., concur.
FAULKNER, J., recused.

ON APPLICATION FOR REHEARING
TORBERT, Chief Justice.
After the original opinion was issued, a motion was made by the appellees to *430 amend the original judgment by adding thereto, pursuant to § 12-22-72, Code 1975, ten percent of $2,653,152.88, the amount the circuit court ordered the Bank to pay into the two trust funds. The motion is denied.
The ten percent penalty provided by § 12-22-72 is not imposed unless the judgment is for money. Lloyd v. Stewart, 258 Ala. 627, 64 So.2d 884 (1953).
The appellees took the position in their briefs and oral argument that this was not a suit at law for money damages, but was a request for equitable relief to enforce the duties of a paid trustee.
The judgment of the circuit court declared that certain purchases and sales of securities by the Bank, as trustee of the Equity Fund and the Bond Fund, were imprudent and that the transactions constituted a breach of the fiduciary duty owed by the Bank to the plaintiffs and their classes, and ordered the Bank to do specified acts to put the two trust funds and the classes of plaintiffs in the same position they would have occupied if the Bank had not breached its duty but had fully performed.
Section 12-22-72, Code 1975, provides that when a judgment or decree is entered for money, whether debt or damages, and the same has been stayed on the execution of bond with surety, if the appellate court affirms the judgment of the court below, it must also enter judgment against all or any of the obligors on the bond for the amount of the affirmed judgment, 10% damages thereon, and the costs in the appellate court.
In Wheeler v. First National Bank of Santa Anna, Cal., 10 Cal.2d 185, 73 P.2d 889, 892 (1937), where the beneficiary of a trust sought to cancel transfers made by trustee to trustor, it was held that a provision for the payment of $5,000 into the trust corpus by the defendant was not a money judgment for damages or debt.
In Moore v. Carney, 84 Mich.App. 399, 269 N.W.2d 614, 617 (1978), where the judgment ordered a corporation and two of its directors to restore a minority shareholder to the position she occupied prior to oppressive acts, which began in 1969, by requiring the defendants to purchase the minority shareholder's stock from her at the value of the stock in 1969, it was held that the judgment was not a money judgment but was part of an equitable remedy.
The judgment in this case was not a judgment for money as debt or damages. Section 12-22-72, Code 1975, does not apply to this judgment. Rather, the treasury bill rate of interest will continue to be applied until the funds are restored to the beneficiaries.
ORIGINAL OPINION MODIFIED; OPINION EXTENDED; AFFIRMED; MOTION FOR PENALTY DENIED; APPELLANT'S APPLICATION FOR REHEARING OVERRULED; APPELLEES' APPLICATION FOR REHEARING GRANTED.
JONES, SHORES, EMBRY,[*] BEATTY, and ADAMS,[*] JJ., concur.
FAULKNER, J., recused.
NOTES
[1] This case was previously before this Court in an unsuccessful attempt by First Alabama Bank to appeal from the class certification. First Alabama Bank of Montgomery, N.A. v. Martin, 381 So.2d 32 (Ala.1980).
[2] First Alabama had also filed several affirmative defenses dealing with the statute of limitations, laches, estoppel, release, and acquiescence. It was agreed that these issues would not be heard by the advisory jury, so additional evidence was heard on these issues, as well as to the extent of damages suffered by the plaintiffs, after the advisory jury was dismissed.
[*] The trial court concluded that the purchases of these stocks were imprudent.
[**] While this Justice did not sit at oral argument, he has listened to the tapes of the oral arguments and has studied the briefs.
[*] While this Justice did not sit at oral argument, he has listened to the tapes of the oral arguments and has studied the briefs.