INGRAM, Justice.
In 1984, Alamex, Inc., and Resource Consultants, Inc. (“RCI”), entered into an agreement concerning RCI’s use of certain property in which Alamex holds a leasehold interest. Pursuant to the terms of the agreement, RCI acquired the right to use the property for the purpose of conducting its business operations, which consist of the unloading, treatment, storage, and disposal of waste solids and liquids. The term of the agreement was 10 years; RCI had the option to renew the term for an additional five years. RCI used four settling ponds located on the premises. Three ponds were used to hold wastewater before treatment, and one pond was used to hold wastewater after treatment.
Disagreements arose between the parties concerning certain amounts of money each owed to the other and concerning performance of the agreement between the parties. RCI sued, claiming that Alamex had not repaid the entire balance due on a loan that RCI had made to Alamex. Alamex counterclaimed against RCI, contending that RCI had failed to pay certain fees due under an agreement between the parties. At trial the issue of the settling ponds and the potential environmental damage that might result from their continued use was presented. After an ore tenus proceeding, the trial court determined that the total amount of principal and interest due on Alamex’s note to RCI (including a reasonable attorney fee) was $375,677.49. The trial court also found that RCI owed Ala-mex $74,035.15. These findings resulted in a net award to RCI of $302,642.34. The trial court also found that the continued use of the ponds might cause potential environmental damage and, therefore, entered an order requiring RCI to close the ponds[1] in question located on Alamex’s property in accordance with all applicable state and federal laws and regulations.
The only issue raised on appeal is whether the trial court erred in ordering the closure of the ponds.
A landlord can terminate a lease, seek injunctive relief, and/or sue for mon *636 ey damages for “waste” committed on his property by a tenant. Restatement (Second) of Property § 12.2(2) (1976). A landlord has a right to have his property maintained by the tenant: “It is the well-established rule in this state that a tenant who, without authority, materially changes or permits such changes in the rented building is guilty of waste.” Corona Coal Co. v. Hendon, 213 Ala. 323, 325, 104 So. 799, 800 (1925). A court can exercise its equitable powers to prevent or correct a tenant’s damage to his landlord’s property:
“ ‘It is, in general, no justification for an act of waste that a party will, at some future time, put the premises in the same condition as they were when the lease was made....
“ [1]... The preventive jurisdiction of a court of equity, through the aid of an injunction, is freely exercised to protect ■ the reversion against waste by the tenant in possession....’”
F.W. Woolworth Co. v. Nelson, 204 Ala. 172, 175, 85 So. 449, 452 (1920) (quoting Agate v. Lowenbein, 57 N.Y. 604 (1874)). Furthermore, a court is authorized to mold its judgment so as to adjust the equities of the parties and meet the necessities of each situation. First Alabama Bank of Montgomery, N.A. v. Martin, 425 So.2d 415 (Ala.1983). “Equity grants full relief when it has jurisdiction on any equitable ground to grant relief ..., and having assumed jurisdiction upon the invocation of the parties, the court will determine all of the interrelated equities of the whole.” Plateau Cemetery Association v. Kidd, 481 So.2d 378, 380 (Ala.1985).
As noted above, three ponds in question here are used to hold wastewater before treatment, and one pond is used to hold wastewater after treatment. The pond used to hold water after treatment is metered and discharged into the Mobile Water System. The record reveals substantial evidence that the ponds were in poor condition and were leaking. According to the testimony of the terminal manager for Alamex, the berms of the ponds were leaking. He testified that the ground around the ponds was saturated with what appeared to be oil. Further, he stated that the condition of the ponds had changed greatly over the years and that they were now contaminated with oil.[2] An employee of the Alabama Department of Environmental Management (ADEM) also inspected the premises and reported that there was evidence that the sides of one of the ponds were deteriorating and that that pond’s liner[3] appeared to be gone.
There was substantial evidence that RCI no longer needed the ponds to operate its business. According to the testimony of RCI president Johnny Sanders, no waste material had been put into the ponds in the last three years. Rather, he testified, RCI was currently using steel tanks instead of the ponds, at the request of its customers. Further, the record reveals that RCI had pumped impermissible materials into the ponds. According to the testimony of one of RCI’s operations managers, RCI regularly, in violation of its “state indirect discharge permit,” solicited and accepted bilge water and oil from vessels and pumped those materials into the ponds. In fact, shortly before the beginning of trial, ADEM had fined RCI $6,000 for improperly transporting waste oil to one of the holding ponds, which had subsequently overflowed and discharged approximately 300 gallons of oil into the surrounding wetlands area.
We need not state further details; suffice it to say that the record is replete with evidence that RCI has used the ponds improperly. Clearly, the trial court’s concern over the condition of the settling ponds and the potential environmental damage that might result from their continued use was well founded. Therefore, we cannot hold that the trial court erred in ordering RCI to close the ponds.
*637 The judgment is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.

. Closing a pond involves removal of the liquids from the pond, excavation of the soils to a certain level, and backfilling of material into the pond — in other words, removing the contaminated soils and replacing them. Sometimes a compacted clay cap is required to be used as a cover over the pond to keep down erosion.

. Photographs and a videotape depicting the condition of the ponds and the surrounding area were admitted into evidence.

. The purpose of the liner is to seal the material in the pond from the ground underneath it. It acts as a retard for water migrating into surrounding water.