## Parsky v. First Union Corp.

*Allen D. Black,* for plaintiffs.
*C. Clark Hodgson,* for defendant.

HERRON, *J.,* May 8, 2001—This opinion addresses the motion of plaintiffs Robert Parsky and Ann Roantree to certify a class of investors who allegedly incurred substantial tax liabilities due to defendant First Union Corporation's conversion of nine common trust funds.

According to the plaintiffs, it is not so much the *conversion* of the common trust funds that led to the high taxable gains for the plaintiffs, but rather the sale of stock done *in anticipation of the funds' conversion* that did so.

Even First Union Corporation appears to concede that those who invested in the same common trust fund as the plaintiffs may be certified as a class of some kind. This is because all investors in the plaintiffs' fund owned shares of that fund, which in turn owned shares of stock. Thus, a sale of stock made in anticipation of the conversion described *infra* impacted all investors in that fund proportionately.

Because the conversion supposedly impacted investors in trust funds other than the plaintiffs' own, however, the plaintiffs seek certification of a class that includes investors in an additional eight funds. First Union Corporation, in contrast, seeks to whittle down the size of the class by questioning the propriety of including investors in all nine common trust funds. At this stage, however, First Union's concerns are without merit, and the court has certified the nine-fund class as proposed by the plaintiffs.

## FINDINGS OF FACT

(1) First Union Corporation is a North Carolina corporation that regularly does business in Pennsylvania and maintains a place of business at 123 South Broad Street, Philadelphia, Pennsylvania. Answer at ¶3.

(2) Plaintiffs Robert Parsky and Ann Roantree are individuals residing at 348 South Fourth Street, Philadelphia, Pennsylvania. Complaint at ¶1.

(3) Through an individual trust managed by CoreStates Financial Corporation, plaintiffs owned shares in the CoreStates Growth & Income Equity Trust. Answer at ¶7-9.

(4) First Union acquired Signet Banking Corporation in December 1997 and CoreStates in April 1998. Answer at ¶3. Through these acquisitions, First Union became the trustee of Signet's and CoreStates' 33 common trust funds (collectively, acquired funds), as well as the underlying trusts whose assets were invested in the common trust funds (collectively, underlying trusts).[1] *Id.*

(5) There were two types of investors in each of the acquired funds: (1) persons for whom the relevant trustee had discretionary investment authority (discretionary investors); and (2) persons from whom the trustee required investment authorization (nondiscretionary investors). Deposition of Michael S. Spangler at 49-50.

(6) At some point prior to December 1998, First Union decided to consolidate the acquired funds with its own Evergreen family of mutual funds through the following process:

"(a) Each of the acquired funds would be matched with a specific Evergreen fund with similar investment policies, styles and investment goals;

"(b) The assets of the acquired fund would be transferred to the corresponding Evergreen fund in exchange for shares of the Evergreen fund;

---

1. The underlying trust funds are referred to as the "underlying trusts."

"(c) The acquired fund would distribute shares of the Evergreen fund to acquired fund investors in exchange for the outstanding shares of the acquired fund; and

"(d) The acquired fund would be terminated."[2] Spangler Deposition at 6-7.

(7) Although First Union has asserted that the conversion was in its customers' best interests, the plaintiffs allege that First Union's motivation was "to streamline operations, reduce costs, increase fee income, and grow the Evergreen mutual funds." Plaintiffs' memorandum at 5.

(8) In December 1998, Michael S. Spangler was named project manager for the conversion, which was known as "Project U2." Spangler deposition at 6. By January 1999, Spangler and his team had identified 28 acquired funds ripe for conversion, as well as matching Evergreen funds into which their assets could be transferred.[3] *Id.* at 8, 40.

(9) In Project U2 meetings over the next several months, Spangler and his team resolved that the 14 fixed income common trust funds would be converted on June 25, 1999 and that 13 of the equity common trust funds would be converted on July 9, 1999.[4] *Id.* at 45-46, 60.

(10) Preparations for carrying out Project U2 were broken down into two parts: (1) communications about Project U2 with First Union customers and (2) prepar-

---

2. This process is referred to as the "conversion."

3. The plaintiffs contend that the conversion of one equity fund was delayed until October 2000 because of concerns expressed by some trust officers. Plaintiffs' memorandum at 6 n.5.

4. The fixed income and equity funds are collectively referred to as the "Project U2 funds."

ing for the conversion itself. Spangler deposition at 47. The plaintiffs assert that Project U2 was a singular, unified project and that actions were taken on a project-wide basis, as evidenced by the following:

• Similar form letters were sent to investors in all of the Project U2 funds. *Id.* at 51-52;[5]

• The letters sent to Project U2 funds investors who are members of the class, as proposed by the plaintiffs, assured recipients that converting the funds would not result in federal income tax liability. Plaintiffs' memorandum exhibit B;[6]

--------

5. The plaintiffs have attached copies of each of the letters as plaintiffs' memorandum exhibit B. According to their headings, the letters are categorized not according to the fund in which the investor invested but rather where the investor lived, whether the investor was charitable or noncharitable, and whether the investor was discretionary or nondiscretionary, as follows:

Letter A—discretionary, noncharitable

Letter B—nondiscretionary, noncharitable

Letter C—standard, nondiscretionary, follow-up

Letter D—discretionary, charitable

Letter E—nondiscretionary, charitable

Letter F—charitable, nondiscretionary, follow-up

Letter G—Delaware

Letter H—Delaware follow-up

Letter I—discretionary New Jersey

Letter J—discretionary, noncharitable, New York

Letter K—nondiscretionary, noncharitable, New York

6. Letters D, E and F, which were sent to charitable investors, do not contain this language. Because charitable investors were not required to pay federal income taxes on the capital gains they incurred, however, the plaintiffs concede that such investors have no claims against First Union whatsoever and are excluded from the proposed class. See plaintiffs' memorandum at 7 n.7.

• Disclosure statements sent to Project U2 funds investors were identical. Spangler deposition at 57-59;

• For each Project U2 fund, a monthly "pro forma" portfolio holding analysis of the prospective combined post-conversion mutual funds was prepared. *Id.* at 58;

• Planning and scheduling for all of the Project U2 funds was done collectively. *Id.*;

• Pricing policies and tax ramifications were reviewed for all of the Project U2 funds. *Id.*;

• Project U2 meetings applied to all of the Project U2 funds. *Id.* at 46; and

• All of the equity funds were converted on June 25, 1999, and all of the fixed income funds were converted on July 9. *Id.* at 60.

(11) While including the same promise of a tax-free conversion, the letters invited slightly different responses:

• The initial letters sent to nondiscretionary investors, as well as to Delaware and nondiscretionary non-charitable New York investors warned that failure to authorize the conversion could result in federal income tax liabilities and requested approval for the conversion by the return of an authorization form. Motion exhibit B at letters B, G, K. The follow-up letter sent to nondiscretionary and Delaware investors renewed First Union's conversion offer and stated that if no response was received by June 15, 1999, "we will assume that you have authorized this change and proceed to convert the common trust funds held in your account into Evergreen mutual funds." *Id.* at letters C, H.

• The letters sent to New Jersey discretionary investors stated that it would convert their investments if First

Union did not receive written objections within 30 days. *Id.* at letter I.

• The letters sent to discretionary investors and to nondiscretionary noncharitable New York investors did not request approval for the conversion. *Id.* at letters A, K.

All class members who received authorization forms received identical forms. Spangler deposition at 57-59.

(12) The plaintiffs received the letter sent to nondiscretionary investors and allegedly completed and returned the requisite authorization forms on May 18, 1999. Complaint at ¶¶19, 20a.

(13) First Union intended for the conversion to be a mechanical, tax-free process because it would meet the requirements of Internal Revenue Code §584(h). Spangler deposition at 10. According to First Union, one of the section 584(h) preconditions for a tax-free conversion is that "substantially all," *i.e.,* more than 90 percent, of the assets of the common trust fund to be terminated must be transferred to the new fund. *Id.*

(14) To induce the manager of each relevant Evergreen fund to accept the requisite 90 percent of the corresponding Project U2 fund assets, each Evergreen fund manager was told that any securities held by the Project U2 fund "that the participating Evergreen fund portfolio manager does not wish to receive will be disposed of prior to conversion." Plaintiffs' memorandum exhibit C.

(15) Beginning in December 1998, the plaintiffs assert that the equity funds began to incur unusually large taxable capital gains. Plaintiffs' memorandum at 8. The gains allegedly continued through June 1999 and, in

some cases, intensified in the weeks before the conversions took place on July 9, 1999. *Id.*

(16) In addition, the plaintiffs claim that much of the gains in this period were short-term in nature, in contrast to past years in which little or no short-term capital gains had been incurred. Plaintiffs' memorandum at 8-9.

(17) The plaintiffs contend that, for all but one of the equity funds, the gains incurred by investors in the first 190 days of 1999 was between two and four times greater than the taxable gains incurred in an average 190-day period in prior years. Plaintiffs' memorandum at 8.

(18) Making matters worse, First Union allegedly did not inform investors of the gains until it sent out tax information in January or February 2000, after the close of the calendar year precluded investors from engaging in tax planning to offset or to prepare for the gains. Plaintiffs' memorandum at 9.

(19) The plaintiffs allege that they themselves incurred a total of $107,734.48 in gains in the three-month period surrounding the conversion, including at least $65,000 in short term capital gains. Complaint at ¶24.

(20) The conversion of the equity funds took place on July 9, 1999 as planned. Defendant's memorandum at 6. Because more than 90 percent of the equity funds' assets were exchanged, the conversion itself complied with section 584(h) and, in isolation, was free of tax consequences. *Id.* at 15.

(21) According to the plaintiffs, however, the gains resulted from sales made at the direction of the Evergreen funds managers, who ordered the sales because the securities in the Project U2 funds were not suffi-

ciently similar to the securities in the Evergreen funds or were not to their liking.[7] Plaintiffs' memorandum at 9.

(22) On the basis of this allegation, the plaintiffs intend to show at trial that the gains and resulting sizeable tax bills were caused by securities sales that were a direct result and were done in anticipation of the conversion. Plaintiffs' memorandum at 9.

(23) In the complaint, the plaintiffs assert two causes of action: a breach of contract claim, based on the letters' promise of a tax-free conversion; and a breach of fiduciary duty claim, based on First Union's alleged misconduct. Complaint at ¶¶35-58.[8]

(24) In the motion, the plaintiffs seek certification of the following class:

"[A]ll persons (including, but not limited to, individuals, proprietorships, partnerships, corporations, trusts and other business entities) who incurred tax liability by reason of capital gains from December 1998 through December 1999 on any investment held in any Core-States or Signet Bank common trust fund that was converted by First Union into shares of an Evergreen mu-

---

7. As mentioned *supra,* one of the conditions for a section 584(h) conversion is that at least 90 percent of the common trust assets must be transferred to the new fund. Spangler deposition at 10; 26 U.S.C. §584(h). Here, the plaintiffs argue that the Evergreen fund managers would accept 90 percent of the conversion funds assets only if they were of a type that met with Evergreen fund criteria. Plaintiffs' memorandum at 9. To meet this manager-imposed requirement, the managers of the acquired funds were forced to sell their own assets/shares, creating the gains. *Id.*

8. The assertions set forth in the previous paragraph would satisfy the causation element for the plaintiffs' causes of action.

tual fund on July 9, 1999."[9] Plaintiffs' memorandum at 10.

(25) The Project U2 funds that meet the requirements of the last phrase of the class description are the Core-States Growth & Income Equity Trust, the CoreStates Growth Equity Trust, the CoreStates Charitable Equity Trust,[10] the CoreStates Value Equity Trust, the CoreStates Union County Equity Trust, The CoreStates Balanced Trust, the Signet Investors Equity A Fund, the Signet Investors Equity B Fund and the Signet Capital Growth Fund.[11] Plaintiffs' memorandum at 10.

## DISCUSSION

The purpose behind allowing class action suits is to provide a means "by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 397, 676 A.2d 1237, 1239 (1996) (citing *Bell v. Beneficial Consumer Discount Co.,* 465 Pa. 225, 231, 348 A.2d 734, 737 (1975)). See also, *Lilian v. Commonwealth,* 467 Pa. 15, 21, 354 A.2d 250, 253 (1976) ("[t]he class action in Pennsylvania is a proce-

---

9. The class proposed by the plaintiffs is referred to as the "class."

10. As noted *supra,* the plaintiffs concede that charitable investors have no valid claims against First Union. Plaintiffs' memorandum at 7 n.7. Based on this fund's title, it is unclear if there are investors in this fund who should be included in the class action.

11. These nine funds are referred to collectively as the "certification funds."

dural device designed to promote efficiency and fairness in the handling of large numbers of similar claims"). For a suit to proceed as class action, Rule[12] 1702 requires that five criteria be met:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or common fact common to the class;

"(3) the claim or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."[13] Rule 1702.

In contrast to Federal Rule of Civil Procedure 23, which governs class action suits brought in federal court, in Rule 1702 "does not require that the class action method be 'superior' to alternative modes of suit." *Weinberg v. Sun Co. Inc.,* 740 A.2d 1152, 1163 (Pa. Super. 1999).

The burden of proving each of these elements is initially on the moving party, although this burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be

---

12. Each Pennsylvania Rule of Civil Procedure is referred to individually as a "rule."

13. It has been noted that "the requirements for class certification are closely interrelated and overlapping . . . ." *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982). (citations omitted)

liberally made.' " *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 45, 501 A.2d 635, 637 (1985) (citing *Bell v. Beneficial Consumer Discount Co.,* 241 Pa. Super. 192, 205, 360 A.2d 681, 688 (1976)). Once the moving party has established that each of the elements is satisfied, "the class opponent shoulders the burden, which has shifted, of coming forward with contrary evidence challenging the prima facie case." *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 449-50, 500 A.2d 1137, 1141 (1985).

### I. *Numerosity*

The numerosity requirement for maintaining a class action is not determined by applying a specific formula:

"Whether the number is so large as to make joinder impracticable is dependent not upon any arbitrary limit, but rather upon the circumstances surrounding [each] case. . . . In determining numerosity, the court should examine whether the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants. . . . The class representative need not plead or prove the number of class members so long as she is able to define the class with some precision and affords the court with sufficient indicia that more members exist than it would be practicable to join." *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 120, 131-32, 451 A.2d 451, 456 (1982). (citations and quotation marks omitted)

The parties have provided the following breakdown for the number of investors in each certification fund

as of June 10, 1999, approximately one month before the conversion:

| | |
|---|---:|
| CoreStates Growth Equity Trust | 1,707 |
| CoreStates Charitable Equity Trust | 444 |
| CoreStates Growth & Income Equity Trust | 3,860 |
| Signet Investors Equity A | 192 |
| Signet Investors Equity B | 45 |
| Signet Capital Growth | 36 |
| CoreStates Value Equity Trust | 1,360 |
| CoreStates Union County Equity Trust | 17 |
| Corestates Balanced Trust | 485 |
| *Total* | 8,146[14] |

Even if the class encompasses only a fraction of these investors, the sheer number of potential claims would impose a substantial burden on the judicial system. Thus, the class satisfies the numerosity requirement.

## II. *Commonality*

A plaintiff generally satisfies its burden of showing commonality where "the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent." *Foust v. SEPTA,* 756 A.2d 112, 118 (Pa. Commw. 2000) (citing *Janicik,* 305 Pa. Super. at 133, 451 A.2d at 457). See also, *D'Amelio,* 347 Pa. Super. at 452, 500 A.2d at 1142 ("[w]hile the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members

---

14. Breakdowns are not given either for discretionary or nondiscretionary investors, or for charitable investors, who are excluded from the class.

which can be justly resolved in a single proceeding"); *Allegheny County Housing Authority v. Berry,* 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985) ("[t]he common question of fact means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all"). In examining the commonality of the class' claims, a court should focus on the cause, and not the amount, of the alleged damages. *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992) ("[o]nce a common source of liability has been clearly identified, varying amounts of *damages* among the plaintiffs will not preclude class certification"). (emphasis in original)

As highlighted by the plaintiffs, Pennsylvania courts have found sufficient commonality and have certified classes where a plaintiff asserts breach of contract claims. See *e.g., Sharkus v. Blue Cross of Greater Philadelphia,* 494 Pa. 336, 431 A.2d 883 (1981) (certifying breach of contract class action). This is especially true where the contract in question is a form contract, although "[c]lass actions may be maintained even when the claims of members of the class are based on different contracts so long as the relevant contractual provisions raise common questions of law and fact and do not differ materially." *Janicik,* 305 Pa. Super. at 133, 451 A.2d at 457. (quotation marks omitted)[15] Similarly, courts have certified classes asserting breach of fiduciary duty claims. See *e.g., Buchanan v. Century Federal Savings and Loan Association,* 374 Pa. Super. 1,

---

15. First Union does not argue that there are any material differences in the language of the different letters.

5, 542 A.2d 117, 119 (1988) (certifying class asserting claims for breach of fiduciary duty and breach of contract); *O'Neill v. Sovereign Bank,* no. 9708-0525, 1998 WL 1543498 (C.P. Phila. Dec. 15, 1998) (certifying class action for breach of contract and breach of fiduciary duty claims).

In this case, the plaintiffs contend that they have satisfied the commonality requirement. First, they point to paragraph 31 of the complaint, which lists 22 allegedly common questions of law and fact, including:

• whether First Union was the trustee of the certification funds;

• whether, as trustee, First Union owed fiduciary duties to members of the class, including a duty of loyalty, a duty of candor, a duty of fair dealing, a duty to avoid self-dealing, an affirmative duty to furnish information and disclose all material facts, and a duty to administer the certification funds solely in the beneficiaries' interests, rather than in First Union's own interest;

• whether First Union breached its fiduciary duties to members of the class by failing to furnish information and failing to disclose all the material facts involving the conversion;

• whether First Union breached its fiduciary duties to members of the class by terminating the acquired funds in order to serve its own interests;

• whether First Union breached its fiduciary duties to members of the class by structuring the conversion in such a way that members of the class suffered significant tax consequences in the form of the gains;

• whether First Union breached its fiduciary duties to members of the class by putting its own interests ahead

of the class members' interests in avoiding or deferring tax liability and receiving complete and accurate information about the management of their investments;

• whether First Union's conduct constituted self-dealing;

• whether there is a causal connection between First Union's breach of fiduciary duties and the tax liabilities suffered by members of the class;

• whether First Union is liable to members of the class for the losses they suffered due to First Union's breach of fiduciary duties;

• the appropriate measure of damages for First Union's breach of fiduciary duties;

• whether the letters constituted an offer of a contract to convert class members' investments to shares of the Evergreen funds without class members' or their accounts incurring any federal income tax;

• whether class members, by filling out and returning authorization forms, or by not objecting to the conversions, thereby accepted First Union's offer;

• whether the terms of the contract were sufficiently definite to be enforceable;

• whether class members' performance and their willingness to permit First Union to convert their investments into shares of the Evergreen funds, constituted consideration;

• whether First Union breached its contracts with members of the class by structuring the conversion in such a way that members of the class incurred substantial federal income tax liabilities in the form of gains;

• whether there is a causal connection between First Union's breach of contract and the federal income tax liability incurred by members of the class; and

• the appropriate measure of damages for First Union's breach of contract.

The plaintiffs also cite the uniform and combined operations of Project U2, as well as First Union's alleged common defense that its conduct did not constitute a breach of contract or its fiduciary duty. In addition, the instruments governing the certification funds have similar or identical provisions addressing governing law.

First Union essentially raises three arguments to counter the points raised by the plaintiffs. First, they claim, each of the underlying trusts is governed by a different document with different legal ramifications. In addition, First Union alleges that, because each of the certification funds was managed independently, a trade resulting in gains in one fund had no effect on investors in other funds. Last, in the majority of the underlying trusts, First Union had discretionary power to invest as it wished, removing the need for consent and the basis for a breach of contract claim. None of these arguments is persuasive.

First Union initially asserts that the documents governing each underlying trust differ, with different implications as to the underlying trust beneficiary's right to bring a cause of action. Because each underlying trust was created individually, "[i]f plaintiffs' proposed class were to be certified as requested, factual and legal issues regarding the literally thousands of different trust

documents at issue will abound." First Union's memorandum at 15.

In contrast to First Union's assertions, however, it appears that any differences in the underlying trusts and their governing documents are minor and irrelevant. In class action cases addressing common trust fund claims, courts have not found that differences in underlying trust documents prevent plaintiffs from satisfying the commonality requirement. See *e.g., Meyer v. Citizens & S. Nat'l Bank,* 106 F.R.D. 356 (M.D. Ga. 1985); *Bank One Indianapolis N.A. v. Norton,* 557 N.E.2d 1038 (Ind. Ct. App. 1990); *First Ala. Bank v. Martin,* 425 So.2d 415 (Ala. 1982).[16] Moreover, First Union has not pointed to any specific, significant difference in any of the underlying trust documents,[17] nor has it cited a single case where a court has refused certification of a common trust fund class based on underlying trust instrument differences. Because the claims for breach of contract and breach of fiduciary duty are independent of the language of the underlying trusts, any differences therein, to the extent that they exist, do not prevent certification of the class.

---

16. While not binding, federal cases interpreting the federal class action rules can have persuasive value in Pennsylvania courts. *McMonagle v. Allstate Insurance Co.,* 460 Pa. 159, 167, 331 A.2d 467, 471-72 (1975). The three cases set forth in the text exhaust the list of cases addressing certification of a class of investors in one or more common trust funds.

17. The plaintiffs specifically requested that First Union produce "all documents on which First Union intends to rely in opposition" to the motion, but no instruments governing the underlying trusts have been produced. Plaintiffs' reply at 7-8.

Similarly, First Union's contention that satisfying the causation element will force the plaintiffs to show how each transaction was done in anticipation of the conversion is unfounded.[18] The plaintiffs intend to show that the individual securities transactions should not be examined individually, but rather should be treated as a group. This is because, "once the final decision to convert was made, virtually everything that happened in the common trust funds was related to, and done in anticipation of, the conversion." Plaintiffs' reply at 30. In addition, to the extent that First Union's argument has any validity, it goes to the merits of the plaintiffs' case and cannot be considered by the court at this time. See Pa.R.C.P. 1707, expl. note—1977 ("the merits of the action and the right of the plaintiff to recover are to be excluded from consideration" when considering a motion for certification).[19] As a result, any questions of causation or the necessity of a transaction-by-transaction analysis do not preclude certification of the class.

---

18. First Union asserts that each of the certification funds was managed independently and that security sales that gains in one fund were not made, and therefore did not produce gains, in any other fund. Defendant's memorandum at 16. According to First Union, this requires examinations of each trade to determine whether the trade was made in anticipation of the conversion, whether the trade was consistent with the specific fund's objectives and whether the trade resulted in gains. *Id.* at 18.

19. The court notes that, in the cases cited by the plaintiffs, the court certified classes consisting of, at most, two common trust funds. See *First Alabama Bank of Montgomery N.A. v. Martin,* 425 So.2d 415 (Ala. 1983). In none of those cases, however, does it appear that there was a broad scheme covering so many common trust funds, like the one First Union is alleged to have implemented here.

First Union is correct in contending that the differences between the discretionary and nondiscretionary investors have the potential to create defenses particular to the discretionary investors.[20] Even if this occurs, however, discretionary and nondiscretionary investors still will have identical breach of fiduciary duty claims. Moreover, the court will have the power to remedy any complications by establishing subclasses for discretionary and nondiscretionary investors in accordance with Rule 1710(c), which allows a court to divide a class into subclasses. Cf. *Janicik,* 305 Pa. Super. at 133, 451 A.2d at 456 ("[i]f later refinement of the issues reveals that seemingly similar contractual provisions merit differing interpretations, the court may create appropriate subclasses").[21] As a result, the plaintiffs have satisfied the commonality requirement for establishing a class action.

---

20. The plaintiffs argue that there are no differences in the breach of contract claims of discretionary and nondiscretionary investors. First, they point out that the letters sent to both types of investors included either the statement that the conversion would *"not result in you or your account incurring any federal income tax"* or the other language to that effect. Plaintiffs' memorandum at 18-19. Second, they argue that there are no differences in First Union's defenses to the discretionary and nondiscretionary investor's claims. Plaintiffs' reply at 20-21.

21. The fact that the plaintiffs are nondiscretionary investors would not prevent certification of a class and subclasses. See *e.g., In re NASDAQ Mkt. Makers Antitrust Litig.,* 169 F.R.D. 493 (S.D.N.Y. 1996) (certifying class and subclasses where named plaintiffs had invested only in 60 of the 1,659 securities at issue); *Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 56 (S.D.N.Y. 1993) ("to satisfy the typicality requirement, it is not necessary for the named plaintiffs to have invested in all of the investment vehicles").

## III. *Typicality*

As a third step in the certification test, a class action plaintiff must show that the class action parties' claims and defenses are typical of the entire class. The purpose behind this requirement "is to determine whether the class representatives' overall position on the common issues is sufficiently aligned with that of the absent class members, to ensure that the pursuit of their interests will advance those of the proposed class members." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 404, 676 A.2d 1237, 1242 (1996). The existence of "factual differences with regard to each member of the class does not render the named parties' claims atypical of the class as a whole." *Cribb v. United Health Clubs Inc.,* 336 Pa. Super. 479, 484, 485 A.2d 1182, 1185 (1984) (citing *Ablin Inc. v. Bell Telephone of Pa.,* 291 Pa. Super. 40, 435 A.2d 208 (1981)).

To support their assertion that their claims are typical of the entire class, the plaintiffs point to the following:

• The plaintiffs invested money in one of the certification funds and were beneficiaries of a trust of which First Union was the trustee. Complaint at ¶¶4, 9;

• The funds in which the plaintiffs had invested were subject to the conversion, which First Union said would be tax-free. *Id.* at ¶¶16, 19, 21;

• First Union terminated the fund in which the plaintiffs had invested and converted their investments into Evergreen fund shares, causing the plaintiffs to incur substantial federal income tax liability. *Id.* at ¶¶16, 24;

• The plaintiffs contend that First Union breached its fiduciary duty to them and its contract with them by ter-

minating the trusts and carrying out the conversion in a way that led to their substantial federal income tax liability. *Id.* at ¶¶26, 28;

• The plaintiffs seek money damages as a result of First Union's conduct. *Id.* at ¶¶49, 58;

• There are no conflicts between the interests of the plaintiffs and those of the class, and there are no distinct defenses that the plaintiffs will raise. Plaintiffs' memorandum at 17; and

• Any differences in the forms of the fund in which the plaintiffs invested and the other certification funds are immaterial. *Id.*

First Union disputes the plaintiffs' claims of typicality. Specifically, First Union returns to the argument that the plaintiffs will be required to show that each trade that contributed to the gains was made in anticipation of the conversion. Because trades vary across the certification funds, it asserts, the plaintiffs' claims are not typical, and the plaintiffs will have little incentive to pursue the process of addressing trades in the eight certification funds in which they did not own shares. In addition, because the discretionary investors may not have breach of contract claims, First Union contends that the plaintiffs advancement of those claims will come at the expense of the breach of fiduciary claims and, potentially, the discretionary investors.

The plaintiffs' claims are sufficiently typical to proceed. By arguing that the letters constituted a unilateral contract, the plaintiffs will be advancing the interests of the investors in all of the certification funds. Cf. *Janicik,* 305 Pa. Super. at 134, 451 A.2d at 457-58 (where the plaintiffs put forth an interpretation of a con-

tract affording greater benefits, their self-interest was "squarely aligned with that of the absent members of the class of beneficiaries"). Additionally, the fact that the plaintiffs would have both a breach of contract and a breach of fiduciary duty claim does not undermine their alignment of interests with the discretionary investors, who might be limited solely to a breach of fiduciary duty claim. See *Janicik*, 305 Pa. Super. at 135, 451 A.2d at 458 (a plaintiff's possible claim based on an oral contract "does not dilute her interest in pursuing a favorable interpretation of the written contract on behalf of herself and the class"). Thus, the plaintiffs' claims are typical of those of the entire class.

## IV. *Fair and Adequate Representation*

When reviewing whether a class action plaintiff will fairly and adequately represent the class' interests, a court must consider, among other matters,[22] the criteria set forth in Pa.R.C.P. 1709:

---

22. Courts considering "other matters" have looked at the following:

"Evidence of dishonesty, bad character, disregard of duties, abdication to the unfettered discretion of class counsel, or of having been solicited to be class representative by counsel who are conducting the suit for their own gain, will all weigh against the named party's adequacy as a representative. . . . In contrast, evidence of honesty, willingness to pursue the matter, knowledge of facts underlying the action, understanding of the essence of the legal claim, a desire to right a perceived wrong, or the hope of recovery will all support a named party's adequacy as a representative." *Janicik*, 305 Pa. Super. at 140, 451 A.2d at 461. (citations omitted) The plaintiffs have stated that they are not aware of any other matters that require consideration. Plaintiffs' memorandum at 30.

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,

"(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

"(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed."[23] See also, *Haft v. United States Steel Corp.*, 305 Pa. Super. 109, 117, 451 A.2d 445, 449 (1982) (where plaintiff demonstrated his willingness to pursue the litigation and his considerable knowledge of the underlying facts and circumstances, he was an appropriate class representative).

It is generally presumed that no conflict of interest exists and that the plaintiffs' attorney is adequate. *Janicik,* 305 Pa. Super. at 136-37, 415 A.2d at 458-59.

As demonstrated by the credentials attached to the motion, the plaintiffs' attorneys are capable of representing the interests of the class. See plaintiffs' memorandum exhibit E. In addition, the motion asserts that there are no conflicts of interest and that the plaintiffs have adequate financial resources. Motion at 21.[24] Thus, the plaintiffs have met the requirement of showing they will be fair and adequate representatives of the class.

---

23. Courts have held that "an affidavit of counsel that it will advance the necessary costs is all that is required" to meet the adequate financial resources requirement. *O'Neill,* 1998 WL 1543498, at *7 (quoting *Janicik,* 305 Pa. Super. at 137-38, 451 A.2d at 459-60).

24. The plaintiffs' attorneys also have attached an affidavit regarding advancement of costs to the plaintiffs' memorandum as exhibit F.

## V. *Fair and Efficient Method*

To determine if a class action would constitute a fair and efficient method of resolving the issues in dispute, a court must look for the following criteria:

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action."[25] Rule 1708.

### 1. Predomination of Common Questions of Law

The issues regarding the predomination of common questions of law have been discussed *supra*.

### 2. Management Difficulties

While a court must consider the potential difficulties in managing the class action, any such difficulties generally are not accorded much weight:

"Problems of administration alone . . . ordinarily should not justify the denial of an otherwise appropriate class action, for to do so would contradict the policies underlying this device. *Yaffe v. Powers,* 454 F.2d 1362, 1365 (1st Cir. 1972). Accord, explanatory note to Pa.R.C.P. 1708 (manageability criterion should not be employed as an 'escape hatch' to defeat otherwise proper class action); *Manual for Complex Litigation,* §1.43 (1981). Rather, the court should rely on the ingenuity and aid of counsel and upon its plenary authority to control the action to solve whatever management problems the litigation may bring. *Buchanan v. Brentwood Federal Savings & Loan Ass'n,* 457 Pa. 135, 161, 320 A.2d 117, 131 (1974); *In re Antibiotic Antitrust Actions,* 333 F. Supp. 278, 282-83 (S.D.N.Y.

---

25. First Union challenges the plaintiffs only on the criteria set forth in paragraphs (1), (2) and (5).

1971); Newberg, *Newberg on Class Actions,* §2100." *Janicik,* 305 Pa. Super. at 142, 451 A.2d at 462.

In the instant matter, the parties have "detailed records of the names, addresses and account status and activity for each class member." Plaintiffs' memorandum at 26. In addition, the names and addresses of investors are easily ascertainable from First Union's records. Spangler's deposition at 67-68. As a result, it does not appear that there are any abnormal issues of class manageability.

First Union asserts that the certification of a national class, as proposed by the plaintiff would involve complex choice of laws issues and would complicate the opt-in/opt-out conditions in Rule 1711(b).[26] As highlighted by the plaintiffs, however, five of the certification funds, covering 96 percent of the class members, were expressly governed by Pennsylvania law. Plaintiffs' reply at exhibit I section 13.6; *id.* at exhibit J section 13.6; *id.* at exhibit K section 13.6; *id.* at exhibit L; *id.* at section 20.[27] In addition, First Union has not shown that any law other than Pennsylvania and New Jersey would apply or that any foreign law would be different from

26. First Union appears to recognize that Pennsylvania courts may certify a national class if the conditions of Rule 1702 are met. See *Weinberg,* 740 A.2d at 1164 (Pennsylvania's procedural rules regarding class certification "provide an explicit procedure for residents of other states to submit themselves to our jurisdiction and be included in Pennsylvania class actions").

27. Of the remaining four certification trusts, the plaintiffs contend that the CoreStates Union County Equity Trust is governed by New Jersey law, while the three Signet funds are governed by the law of the "jurisdiction in which the fund is administered." Plaintiffs' reply at 10 n.3.

that of Pennsylvania.[28] Thus, First Union's fears of unmanageability are unfounded.

### 3. Risks of Separate Actions

In considering the effect of separate actions, a court should not limit its review to questions of issue and claim preclusion:

"The precedential effect of a decision, even if incorrect, may have a chilling effect on the assertion of similar claims, and, combined with the expiring of statutes of limitation, may often "substantially impair or impede" potential litigants' ability to protect their interests. Moreover, as with the related criteria concerning the complexity and expenses of litigation, the court may consider the parties' circumstances and respective ability to pursue separate actions." *Janicik,* 305 Pa. Super. at 143, 415 A.2d at 462. See also, *Cambanis,* 348 Pa. Super. at 54, 501 A.2d at 642 ("there are risks of inconsistent adjudications where several trial courts may be faced with seemingly identical cases and the resolution of one case may have a chilling effect on others").

Here, the risk of inconsistent decisions is high. If the class as a whole is not certified, the standard used to determine the cause of the gains at one trial could differ substantially from that used at a different trial. In

---

28. First Union's failure to establish this last point is significant because a court need not engage in a conflict of laws analysis if there is no difference in the substantive laws of the two jurisdictions. See *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 702 (Pa. Super. 2000) ("[i]n Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary").

addition, rulings against a plaintiff in one case could serve as an impediment and a deterrent to other plaintiffs who invested in the same fund. This militates strongly in favor of certifying a class here.

## 4. Prior Litigation

The plaintiffs state that they are not aware of any other litigation involving the issues in this matter. Plaintiffs' memorandum at 27.

## 5. Propriety of Forum

The Philadelphia Court of Common Pleas Trial Division appears to be an appropriate forum for this matter. The plaintiffs are Philadelphia residents, and six funds, comprising the investments of 97 percent of the class members, were managed by CoreStates, which was based in Philadelphia. Plaintiffs' memorandum at 28. The plaintiffs also assert that the vast majority of class members are Pennsylvania residents. *Id.*

First Union returns to the argument it made in its preliminary objections regarding the trial division's lack of jurisdiction. The court has previously discussed this issue in detail and has rejected this argument repeatedly. See *Parsky v. First Union Corp.*, February 2000, no. 771 (C.P. Phila. June 29, 2000) (Herron, J.); *Parsky v. First Union Corp.*, February 2000, no. 771 (C.P. Phila. Aug. 23, 2000) (Herron, J.).[29] In addition, *In re Core-States Trust Fee Litigation*, 39 F.3d 61, 69 n.7 (3d Cir.

---

29. Opinions available at http://courts.phila.gov/cptcvcomp.htm. First Union's appeal on this issue was quashed by the Superior Court on November 2, 2000.

1994), the only case on which First Union relies in its memorandum, does not stand for the principle cited by First Union.[30] Indeed, the Third Circuit specifically refrained from addressing "the validity of CoreStates' claim that, in the area of trusts and estates, the federal court should abstain out of deference to the state orphans' court's expertise." 39 F.3d at 69 n.7. Thus, the Philadelphia Court of Common Pleas Trial Division is an appropriate forum for the resolution of this matter.

### 6. Feasibility of Separate Actions and Recovery of Individual Class Members

Although no precise figures are given, the plaintiffs assert that recovery for most class plaintiffs will be less than $50,000. Plaintiffs' memorandum at 29. This is low enough to preclude separate actions for each plaintiff. Given the size of the alleged gains, however, it appears that the size of the recovery will be large enough to justify the expense and effort of maintaining this suit as a class action. Cf. *Kelly v. County of Allegheny,* 519 Pa. 213, 223-24, 546 A.2d 608, 613 (1988) (recovery of $13.61 per plaintiff was neither "trivial" nor "de minimis" and justified class action). As a result, the plaintiffs have satisfied all seven elements to show that a class action is a fair and efficient method of resolving this dispute and are entitled to certification of the class.

---

30. According to First Union, the *CoreStates* court "not[ed the] deference to state orphans' courts in matters involving trust administration." Defendant's memorandum at 23.

## VI. *Standing*

In addition to challenging the plaintiffs on the five class action criteria, First Union argues that the plaintiffs lack standing to bring the instant action. Generally, to have standing, a party must satisfy the following test:

"[O]ne . . . must show a direct and substantial interest and a sufficiently close causal connection between the challenged action and the asserted injury to qualify the interest as 'immediate' rather than 'remote.' . . . [A] substantial interest requires some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. . . . Direct simply means that the person claiming to be aggrieved must show causation of the harm to his interest . . . . The immediacy or remoteness of the injury is determined by the nature of the causal connection between the action complained of and the injury to the person challenging it." *DeFazio v. Civil Service Commission,* 562 Pa. 431, 756 A.2d 1103, 1105 (2000). (citations omitted) See also, *J.A.L. v. E.P.H.,* 453 Pa. Super. 78, 86, 682 A.2d 1314, 1318 (1996) ("the proponent of the action must have a direct, substantial and immediate interest in the matter at hand").

A class action plaintiff is required to have standing, although a plaintiff satisfies the requirements of standing when he or she is "a member of the class which he or she seeks to represent at the time the class is certified by the court." *Janicik,* 305 Pa. Super. at 135, 451 A.2d at 458 (quoting *Sosna v. Iowa,* 419 U.S. 393, 403 (1975)). Cf. *Alessandro v. State Farm Mutual Automobile Insurance Co.,* 259 Pa. Super. 571, 580, 393

A.2d 973, 977 (1978), *aff'd in part, rev'd in part on other grounds,* 487 Pa. 274, 409 A.2d 347 (1979) ("[i]f the representative before the court does not seek to raise on his own behalf a case or controversy substantially alike those of the absent members of the class, he lacks standing to act as a class representative"). Because the plaintiffs allegedly incurred capital gains tax liability between December 1998 and December 1999 through their investment in one of the certification funds, they are members of the class and meet the requirements for standing.

Relying on *D'Amelio v. Blue Cross of Lehigh Valley,* 414 Pa. Super. 310, 606 A.2d 1215 (1992), First Union contends that the "plaintiffs cannot step into the shoes of any trust fund participant other than one invested in the CoreStates Growth and Income Equity Trust, as plaintiffs did not suffer a similar injury as a result of the conversion process. . . ." First Union's memorandum at 11. First Union's reliance on *D'Amelio* is misplaced, however. The opinion cited by First Union was the second opinion issued by the Superior Court in *D'Amelio* and addressed the plaintiffs attempt to add 19 hospitals with which he had had no dealings as defendants.[31] The court concluded that the plaintiff did not have standing to bring claims against the additional defendants because "[n]one of the other hospitals sought to be joined engaged in conduct which contributed to

---

31. In *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 500 A.2d 1137 (1985), decided seven years earlier, the Superior Court reversed the lower court's denial of certification and certified a class of persons who had been denied medical coverage by Blue Cross at one specific hospital.

the injury he suffered . . . ." 414 Pa. Super. at 315, 606 A.2d at 1217. Here, in contrast, it is the same conduct, *i.e.,* First Union's undertaking of Project U2, that allegedly led to harm to all the members of the class and that the plaintiffs challenge. Cf. *Nye v. Erie Insurance Exchange,* 504 Pa. 3, 6, 470 A.2d 98, 100 (1983) ("a plaintiff in a class action who has not suffered an injury from the challenged conduct of a defendant cannot maintain a class action against that defendant" due to lack of standing). As a result, *D'Amelio* does not support the contention that the plaintiffs lack standing, and First Union's argument must be dismissed.

## CONCLUSIONS OF LAW

(1) The class is sufficiently numerous that joinder of all members is impracticable.

(2) There are questions of law and fact common to the class.

(3) The claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class.

(4) The representative plaintiffs will fairly and adequately assert and protect the interests of the class.

(5) The attorney for the representative plaintiffs will adequately represent the interests of the class.

(6) There is no conflict of interest between the representative plaintiffs and the class members which would impede the maintenance of a class action.

(7) The representative plaintiffs have or can acquire adequate financial resources to assure the class interests will not be harmed.

(8) The class action will provide a fair and efficient method for adjudicating this controversy.

(9) Common questions of law or fact predominate over any question affecting only individual members.

(10) There are no difficulties in case management which would preclude litigating this matter as a class action.

(11) Prosecution of separate actions by class members would create a risk of inconsistent and varying adjudications and might confront First Union with incompatible standards of conduct.

(12) Individual adjudications would, as a practical matter, dispose of the interests of other class members not parties to the adjudication, or would substantially impair their ability to protect such interests.

(13) This particular forum is appropriate for the litigation of the entire class' claim.

(14) The complexities of the issues, the expenses of litigation and the small amount of each individual class member's claim make it impossible to support or justify the presentation of separate claims.

For these reasons, the court is satisfied that the instant case is appropriate for disposition as a class action and has certified the class.

## ORDER

And now, May 8, 2001, upon consideration of plaintiffs Robert Parsky and Ann Roantree's motion for class certification, defendant First Union Corporation's opposition thereto, oral argument before the court and all other matters of record, and in accord with the opinion

being filed contemporaneously with this order, it is hereby ordered and decreed as follows:

(1) The above-captioned action is certified as a class action for claims of breach of contract and breach of fiduciary duty;

(2) The class shall consist of all persons (including, but not limited to, individuals, proprietorships, partnerships, corporations, trusts and other business entities) who incurred tax liability by reason of capital gains from December 1998 through December 1999 on any investment held in any of the following funds: the CoreStates Growth & Income Equity Trust, the CoreStates Growth Equity Trust, the CoreStates Charitable Equity Trust, the CoreStates Value Equity Trust, the CoreStates Union County Equity Trust, the CoreStates Balanced Trust, the Signet Investors Equity A Fund, the Signet Investors Equity B Fund and the Signet Capital Growth Fund;

(3) Plaintiffs Robert Parsky and Ann Roantree shall serve as class representatives; and

(4) The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within thirty days from the date of this order.