Walter E. Heller Company (Heller) brought an action against Appellants for monies due Heller under a lease executed by Charles Israel as President of Charles Israel Chevrolet, Inc., and guaranteed by both Economy Finance, Inc., and Charles Israel, individually. The trial court, sitting without a jury, entered a judgment for Heller. We affirm.
Charles Israel purchased Wood Chevrolet Company in January of 1981 and changed the name of the dealership to Charles Israel Chevrolet (CIC). Charles Israel was president of both CIC and Economy Finance, Inc. (EFI).
Shortly after Israel purchased the dealership, he was approached by Pete Wilson, an employee of Blackstocks, Inc. Israel and Wilson discussed a service offered by Blackstocks known as "parts return," whereby Blackstocks would inventory and box the large volume of undesirable parts and materials from the previous dealership and ship these parts to the manufacturer, which, in turn, would allow CIC full credit for these parts when CIC ordered new parts for restocking. Blackstocks, via written quotation, offered to perform the parts return for six percent (6%) of the total value of the parts returned, with payment "due upon completion." CIC accepted Blackstocks' proposal and quotation.
A second proposal made by Blackstocks to CIC was for the performance of a planograph (a computer study of the parts stocked by CIC) and for a recommendation, based on the results of the planograph, for the best manner of storing parts based on size and demand. The written quotation for the planograph study was accepted by CIC on the same day the first quotation was accepted. The payment term for the second quotation was "net ten days."
Blackstocks performed the parts return and the planograph. The computer study revealed that new parts storage bins and shelves were necessary. Blackstocks, in a third written quotation, offered to sell to CIC new bins and new shelves and to supply the labor necessary to erect the new bins and shelves and to restock when the new parts arrived. The third quotation from Blackstocks to CIC included a figure for implementation of the planograph study results in supplying and restocking the new bins and shelves. This quotation also summarized the amounts already due Blackstocks from CIC and later included the price of a steel platform not originally discussed. CIC accepted this third quotation, which reflected a total figure of $64,575.21.
Although the record is unclear as to an exact time, it appears that either during the time Blackstocks was performing the planograph or at the time the planograph was completed, a Blackstocks representative told Charles Israel that financing for the Blackstocks services could be arranged. The testimony is clear, however, that Heller's name was never mentioned by a Blackstocks representative in any conversation with Israel.
Israel later received a call from a representative of Heller who explained that he was calling Israel at the request of Blackstocks. After several discussions, CIC and Heller reached an agreement and Israel executed a lease to Heller on behalf of CIC, and executed both a corporate guaranty of *Page 73 
the indebtedness as president of EFI, and a personal guaranty.
While the contract executed between Heller and CIC was denominated a "lease," it must be understood in terms of what actually transpired between the parties. Heller purchased from Blackstocks what it understood to be the equipment installed by Blackstocks on CIC's premises and paid therefor the sum of $64,575.21 — the exact amount of the indebtedness owed by CIC to Blackstocks. Israel testified at trial that the contract between CIC and Heller was set up as a "true lease" (as opposed to a sale), because CIC had no need of an investment tax credit and because Israel wanted to keep the monthly payments as low as possible.
At the time Israel executed the lease, Blackstocks had fully performed all services offered to CIC in the three quotations. Blackstocks invoiced Heller for the cost of the equipment and its services to CIC, and Heller issued a check to Blackstocks for $65,575.21 in full payment of the invoice.
CIC began to make monthly lease payments to Heller and continued to do so for several months, paying to Heller a total of $7,179.42. The CIC dealership failed, however, and no further lease payments were made. Because Heller failed in several attempts to collect the balance of the debt owed by CIC, it sued CIC on the lease and guaranties.
At trial, CIC made two arguments in defense of nonpayment. CIC first contended that the lease and guaranties executed by CIC, EFI, and Israel to Heller were unenforceable because Blackstocks, although doing business in this State, had failed to qualify to do business in Alabama as required by Article XII, § 232, Ala. Const. (1901), and § 10-2A-226, Alabama Code 1975 (1984 Supp.). The "contract" between Blackstocks and CIC (as evidenced by the three quotations) was, according to CIC, a voidable contract under § 10-2A-247. This voidable contract, says CIC, was assigned by Blackstocks to Heller, but that assignment to a qualified business (Heller) did not and could not remove the contract's defect. See, generally, Sandjay, Inc.v. Duncan Construction Co., 445 So.2d 876 (Ala. 1983); andFirst Bank of Russell County v. Wells, 358 So.2d 435 (Ala. 1978).
Second, CIC claimed that, even assuming its liability to Heller under the lease and guaranties, the total amount owed Heller should be adjusted to reflect the actual value of the equipment (in accordance with paragraph 7 of the lease), rather than basing the amount due on an allegedly erroneous estimated value as stated on the face of the lease.
The trial judge heard the evidence, both from the testimony of various witnesses and from deposition testimony read into the record at trial. He had before him the lease and guaranties upon which Heller based its claims and could read for himself the disputed lease provisions. He entered a judgment adverse to CIC, but made no express findings of fact.
CIC, on appeal, reargues its position at trial and makes numerous references to portions of the trial transcript. Our review of the trial court's judgment, however, is governed by a familiar standard. The decision of a trial judge, sitting without a jury, upon disputed facts presented orally, will be affirmed on appeal "if it is fairly supported by credible evidence under any reasonable aspect, and is not palpably wrong or manifestly unjust." Whitt v. McConnell, 360 So.2d 336, 337
(Ala. 1978). The principle of this ore tenus rule, with its requisite that the trial court have heard oral testimony, nevertheless, may be applied in cases such as the one now before us, in which part of the evidence at trial was presented in the form of documents and depositions which were read into evidence. "It is the law in Alabama that where evidence has been presented orally, a presumption of correctness attends the trial court's conclusion on issues of facts, if these conclusions were based totally or in part on oral testimony."First Alabama Bank of Montgomery, N.A. v. Martin,425 So.2d 415, 425 (Ala. 1982). *Page 74 
A further qualification of the ore tenus rule is applicable in the instant case. Where, as here, the trial judge enters his decree without making express findings of fact, this Court will assume that he found those facts necessary to support his decree, unless such a finding would have been clearly erroneous or against the great weight of the evidence. Whitt v.McConnell, supra. Further, "[i]t is well settled that where it cannot be determined on what ground or theory judgment was rendered, the finding of the trier of fact is referred to the theory supported by the evidence." Snow v. Boykin,432 So.2d 1210, 1211 (Ala. 1983).
The sole issue in this appeal, then, is whether the record contains sufficient credible evidence to support the trial court's judgment under any reasonable aspect. Our review of the trial transcript convinces us that the trial court's conclusions were clearly supported by the evidence. Because the trial judge here occupied the superior position of seeing the demeanor of witnesses with direct personal knowledge of the ultimate facts of the case, he was in the best position to determine the weight and credibility to be given the testimony of each witness. See Baptist Foundation of Alabama v. Penn,295 Ala. 122, 324 So.2d 766 (1975); Rule 52 (a), A.R.Civ.P.
While the evidence is in dispute with regard to the parties' intentions as to the "financing" of the debt owed by CIC (Heller claiming "purchase" and CIC claiming "assignment"), there was ample credible evidence from which the trial judge could find for Heller. For example, testimony was adduced, not only from the representative of Heller, but from representatives of Blackstocks and from Mr. Israel himself, that there was no discussion at any time of "assignment" of the obligation from Blackstocks to Heller. The trial court could have found not only that the lease and guaranties were meant to be original contracts between Heller and CIC, but that the negotiations for the ultimate execution of these documents (including CIC's obtaining a corporate resolution approving the contract with Heller, CIC's submitting a corporate financial statement to Heller, and Israel's signing all of the Heller forms) involved only CIC and Heller — Blackstocks was never involved in the direct discussions between Heller and CIC.
The evidence indicated that CCI was never invoiced for payment by Blackstocks and that in signing the three Blackstocks quotations CIC had simply accepted general payment terms proposed by those documents. CIC made no payments to Blackstocks. On the other hand, the evidence at trial did show that Heller had been invoiced by Blackstocks for the entire amount due by virtue of the services performed by Blackstocks for CIC and that Heller had paid the total amount due by that invoice. CIC made payments only to Heller under the terms of the lease and guaranties. Moreover, the evidence supports the legal conclusion that Heller's suit sought to enforce an original contract between Heller and CIC without regard to the nature of the legal relationship between Heller and Blackstocks. Thus, CIC's "nonqualified business" defense is without merit.
There was also evidence that the total amount due, as shown on the face of the lease, was determined by considering the cost of the equipment and services provided to CIC. Further, it was brought out at trial that CIC did not question "value" or "cost" of equipment and services until called upon by Heller to honor the terms of the lease and guaranties.
Our review of the trial court's judgment, in light of both the record on appeal and the applicable standard of appellate review, leads to our conclusion that the judgment is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES, and BEATTY, JJ., concur. *Page 75