YATES, Presiding Judge.
The Limestone County Education Association (“LCEA”) and the Limestone County Educational Support Personnel Organization (“LCESPO”), sued the Limestone County Board of Education and its members (hereinafter collectively referred to as “the Board”), and Dr. Les Bivens, the superintendent of the Limestone County Board of Education, on May 18, 1999, alleging a breach of contract and contending that the defendants had wrongfully failed to pay their members longevity pay. LCEA and LCESPO sought declaratory and injunctive relief, as well as a writ of mandamus and/or a writ of certiorari ordering the defendants to pay the longevity pay they claimed was owed to their members.
Following an ore tenus proceeding, the trial court, on July 30, 2002, entered a judgment in favor of the defendants. LCEA and LCESPO appealed following the denial of their postjudgment motion.
LCEA is a professional organization composed of certified teachers employed by the Board. LCESPO is a professional organization composed of persons employed by the Board in noncertified positions, such as cafeteria workers, clerical workers, and bus drivers. LCEA and LCESPO represent the interests of their respective members relative to salary and compensation issues.
Before July 1997, employees of the Board were paid within a salary schedule according to the position in which they were employed and according to the number of years they had been employed in that position. The salary schedule was composed of “steps” that correlated with the number of years an employee had been employed by the Board. Beginning in 1989, the Board adopted a series of pay raises, i.e., longevity pay, for those employees that had completed a specified number of years of service. In 1989, the former superintendent of the Board, Henry A. White, recommended, and the Board passed, a two percent pay raise for employees of the Board who were beginning their 15th year of employment. On June 12, 1995, the Board approved a 'salary increase of five percent for all employees who were beginning their 20th year of employment with the Board. On October 7, 1996, the Board enacted a two percent pay raise for employees that had completed a total of 20 years of service with the *448 Board. The longevity-pay raises applied to both certified and noncertified employees. The employees that had the requisite number of years of service with the Board were given the longevity-pay raises regardless of the number of years the employee had been employed in a particular position. For example, some employees were identified as having experience both in noncertified positions and in certified positions. In 1995, the Board, in a separate action, identified those employees that had experience in both certified and non-certified positions and gave them credit for their total years of experience. Thus, if an employee was a certified teacher at step 10 — i.e., with 10 years of employment with the Board as a teacher — but also had 5 years’ experience as a noncertified teacher’s aide, that employee was credited with 15 years of service.
Andew Swanner served as the custodian of funds and the finance director for the Board from 1984 through August 1997. Swanner was responsible for employee compensation, and he prepared the salary schedules for the Board’s enactment. Additionally, as the custodian of funds, she was familiar with Board policy and state laws affecting employee compensation.
Before 1989, there were only 10 steps on the salary schedule for certified employees. A certified employee received a pay increase each of his or her first 10 years of employment with the Board. After the Board adopted the two percent longevity-pay raise in 1989, Swanner added step 14 to the salary schedule. Following the Board’s adoption of the five percent longevity-pay raise in 1995, Swanner added step 19 to the salary schedule. Finally, after the Board adopted the two percent longevity-pay raise in 1996 for employees completing their 20th year of service, Swanner added step 20 to the salary schedule. Before 1989, the salary schedule for noncertified employees had only 6 steps. A noncertified employee received a pay increase each of his or her first 6 years of employment with the Board. As with the certified employees, Swanner added steps 14,19, and 20 to the salary schedules for the noncertified employees following each longevity-pay increase.
Swanner testified that when the Board approved the two percent longevity-pay increase in 1989 the Board’s salary schedule for the following year included the two percent increase. She stated that when the Board approved the five percent longevity-pay increase in 1995 the salary schedule for the following year included that increase. Likewise,' Swanner stated that when the Board approved the two percent longevity-pay increase in 1996 that pay increase was included in the following year’s salary schedule. Swanner specifically testified as follows:
“Q. So what I want to make sure of is that when the Board chose to pay the two percent, the five percent, and the two percent, it put it into the salary schedule and adopted that salary schedule for the next year?
“A. Yes.”
Dawn Nicholson, a payroll-department employee since 1989 and the payroll clerk since 1997, testified that the longevity-pay raises were “built into” the salary schedules.
In 1997, the state legislature passed a salary matrix, which prescribed the salaries for teachers with various levels of experience. A salary schedule based on the state salary matrix was presented to the Board for the 1997-1998 school year by Dr. Les Bivens, the newly appointed superintendent. The Board, on July 7, 1997, adopted this salary schedule for the 1997-1998 school year. The 1997-1998 salary schedule applicable to certified employees had 24 steps. The 1997-1998 sala *449 ry schedule made no changes with respect to noncertified employees, because the state salary matrix applied only to certified employees. Noncertified employees continued to have steps 1-6, 14, 19, and 20 on their 1997-1998 salary schedule. Thus, certified employees did not receive longevity pay as it existed before the 1997-1998 school year, but noncertified employees did receive the longevity pay. Subsequent salary schedules adopted by the Board for the school years 1998-1999,1999-2000, and 2000-2001 did not include longevity pay for any Board employees, and all salary schedules for those years for both certified and noncertified employees contained 24 steps.
Richard Leath, the assistant superintendent for the Board, testified that by adopting the 1997-1998 salary schedule the Board rescinded the longevity-pay increases for certified employees. Leath- stated that each year’s salary schedule, when adopted by the Board, replaced the previous year’s salary schedule. In other words, according to Leath, a vote by the Board to adopt a salary schedule was, in essence, a vote by the Board to rescind the previous year’s salary schedule.
LCEA and LCESPO raise two issues on appeal: (1) that the Board violated state law and its own policies in adopting the state salary matrix and rescinding longevity pay; and (2) that the trial court’s determination that the Board’s adoption of the state salary matrix rescinded the longevity-pay increases and that the longevity-pay increases were not “in addition” to the salary schedules was against the great weight of the evidence. We note that our review of the trial court’s judgment in this matter is governed by the ore tenus rule. This court has stated with respect to the ore tenus rule:
“The decision of the trial judge, sitting without a jury and based upon factual findings from disputed evidence presented orally, is presumed to be correct and will be affirmed on appeal as long as ‘ “it is fairly supported by credible evidence under any reasonable aspect, and is not palpably wrong or manifestly unjust.” ’ Charles Israel Chevrolet, Inc. v. Walter E. Heller & Co., 476 So.2d 71, 73 (Ala.1985) (quoting Whitt v. McConnell, 360 So.2d 336, 337 (Ala.1978)).”
Milligan v. Albertville City Bd. of Educ., 661 So.2d 254, 255 (Ala.Civ.App.1995).
LCEA and LCESPO contend that the rescission of the longevity-pay increases was never proposed by the superintendent or adopted by the Board; therefore, they contend, the trial court erred in determining that the longevity-pay increases had been abrogated by the adoption of the state salary matrix in 1997 and in subsequent school years. LCEA and LCESPO further contend that the Board failed to communicate to them its intention to rescind the longevity-pay increases. Section 16-l-30(b), AIa.Code 1975, provides:
“(b) The local board of education shall, upon the written recommendation of the chief executive officer, determine and establish a written educational policy for the board of education and its employees and shall prescribe rules and regulations for the conduct and management of the schools. Before adopting the written policies,- the board shall, directly or indirectly through the chief executive officer, consult with the applicable local employees’ professional organization. Input by the applicable professional organization shall be made in writing to the chief executive officer.' Representatives of the professional organization shall be made known to the chief executive officer in writing by the professional organization’s duly elected officers or their representative. The chief executive officer of the board may *450 also consult with professional assistants, principals, employees, and other interested citizens. The written policies, rules, and regulations, so established, adopted, or promulgated shall be made available to all persons affected and employed by the board. Any amendments to the policies, rules, and regulations shall be developed in the same manner and furnished to the affected persons employed by the board within 20 days after adoption.”
Board policy provides that:
“The adoption of policy is the responsibility of the Board. For a policy to be adopted by the Board, it must receive a majority vote. A policy introduced and recommended to the Board shall not be adopted until a subsequent meeting. This practice will provide the Board members with time to study the proposed policy and give interested parties an opportunity to react.
“Temporary approval may be granted by the Board in lieu of formal policy to meet emergency conditions or special events which will take place before formal action can be taken.”
“A board of education must comply with the policies it adopts.” Ex parte Board of Sch. Comm’rs of Mobile County, 824 So.2d 759, 761 (Ala.2001). “Salaries are a matter of school board policy. Once the Board adopts a policy, it is bound to follow that policy until the policy is modified or amended by the Board in accordance with the procedures set forth in [§ 16-1-30, Ala.Code 1975[1]]." Beverly v. Board of Sch. Comm’rs of Mobile County, 678 So.2d 113, 115 (Ala.Civ.App.1995) (citations omitted).
Dr. Bivens recommended the proposed salary schedule containing the state salary matrix to the Board as required by § 16-1-30, Ala.Code 1975, and the Board adopted that salary schedule on July 7, 1997. Swanner testified that before the state salary matrix was adopted by the Board on July 7, 1997, it had been discussed at Board work sessions. See Dale v. Birmingham News Co., 452 So.2d 1321 (Ala.1984) (drawing no distinction between informal and formal meetings of the boards of education of this state). Swan-ner stated that the general public as well as members of LCEA were invited to attend those work sessions. She stated that Emmitt Jimmar, the Alabama Education Association (“AEA”) UniServ Director for Limestone County,[2] had attended several of those work sessions. Swanner testified that she thoroughly explained the state salary matrix during those work sessions. She stated that she explained during those work sessions, and that the Board members understood, that employees of the Board would be paid in accordance with the salary matrix, regardless of their experience. Swanner also testified that those in attendance at the work sessions, including LCEA’s officers, had an opportunity to ask questions and state their positions relative to the adoption of the state salary matrix.
Swanner testified that, before the state salary matrix was adopted, she specifically discussed it with LCEA’s officers and its members at a regularly scheduled meeting of LCEA in May 1997. Swanner testified that she gave LCEA’s officers a copy of the salary matrix and explained how the salary matrix worked. She stated that she *451 informed the group that certified employees of the Board would be paid in accordance with the salary matrix for the 1997-1998 school year.
The record indicates there was further discussion regarding the salary matrix and longevity pay before the adoption of salary schedules by the Board in subsequent years. Dr. Bivens testified that he complied with Board policy and state law before recommending salary schedules to the Board in subsequent years. On December 10, 1997, Rhonda Hacker, the president of LCEA for the 1997-1998 academic year, wrote Dr. Bivens a letter stating that it was her position that the longevity pay should be paid in addition to the salary required to be paid by the state salary matrix. Hacker testified that she was requesting that the longevity pay be paid for the 1997-1998 school year and that it also be paid for the 1998-1999 school year. On January 8, 1998, Hacker appeared before the Board at a regularly scheduled meeting and requested that the longevity-pay increases be placed in the 1998-1999 salary schedules. Jimmar appeared before the Board on February 5, 1998, and requested that the longevity-pay raises be reinstated to the salary schedules. Dr. Bivens responded to Hacker’s and Jim-mar’s request by letter on March 3, 1998, stating that he did not agree with the position put forth by Hacker and Jimmar and, further, that the longevity pay would not be reinstated to the salary schedule for the 1998-1999 school year.
Jimmar wrote letters to Dr. Bivens on April 30, 1998, and May 27, 1998, raising questions regarding the longevity pay. The April 30, 1998, letter from Jimmar to Dr. Bivens was copied to Hacker and Liz Wingard, LCESPO’s president. The Board held work sessions on May 18,1998, June 15, 1998, and July 7, 1998, to discuss the 1998-1999 salary schedules. Dr. Bivens testified that Jimmar attended those work sessions. The Board voted to adopt the salary schedules for the 1998-1999 school year on August 3, 1998. Dr. Bivens testified that before he recommended the 1998-1999 salary schedules to the Board, he had before him the positions set forth by LCEA and LCESPO in writing and that he fully understood those positions, but simply disagreed, with them.
Dr. Bivens testified that he consulted with both LCEA and LCESPO before the salary schedules for the 1999-2000 and 2000-2001 school years were recommended and adopted by the Board. In July 1999, Peggy Sanders, LCEA’s president for the 1999-2000 school year, requested that Dr. Bivens forward all policies proposed by the Board to her or Jimmar. Jimmar wrote the Board on June 25,1999, acknowledging receipt of the proposed salary schedules for the 1999-2000 school year and raising certain concerns regarding those schedules. In August 1999, Dr. Bivens requested input regarding, salary schedules from Sanders, Jimmar, and Wingard.
In July 2000 and August 2000, Dr. Bivens again forwarded copies of the salary schedules to the presidents of the LCEA and LCESPO and requested input from each regarding the schedules. Jimmar again responded with questions concerning the proposed salary schedules and addressed the Board at a meeting on November 6, 2000; however, the Board voted to adopt the proposed salary schedules for the 2000-2001 school year.
After reviewing the record, we conclude that the Board complied with § 16-1-30, Ala.Code 1975, and Board policy before adopting the salary schedules for 1997-1998 through 2000-2001 school years. The evidence indicates that before the salary schedules containing the state salary matrix were adopted for those years, they were presented to and discussed with LCEA’s and LCESPO’s representatives at *452 Board meetings and work sessions as well as at LCEA’s meetings. Additionally, the Board consulted with LCEA and LCESPO through correspondence between Dr. Bivens and their representatives in which they were asked for their input on the issue of salary schedules. LCEA and LCESPO were given sufficient opportunities to state their positions on the issue of longevity pay and the salary schedules.
LCEA and LCESPO also argue that there was no evidence presented indicating that the superintendent proposed to rescind the longevity-pay increases. It appears from the record that the practice of the Board was to propose and adopt a salary schedule before each school year and that the salary schedule adopted would rescind and replace the previous year’s salary schedule. The evidence does not suggest that it was the policy of the Board to take a specific action to rescind the previous year’s salary schedule. See Ex parte Board of Sch. Comm’rs of Mobile County, supra (holding that this court must give substantial deference to a board’s interpretation of its policy, if reasonable). As discussed above, before the Board adopted the state salary matrix in July 1997, the matter was presented to and discussed with LCEA. It was made known to the LCEA’s members that they would no longer be paid the longevity increases as in previous years, but, rather, they would be paid in accordance with the state salary matrix. The salary schedule based on the state salary matrix was then recommended to the Board by Dr. Bivens and adopted. Because it was the Board’s practice that a newly adopted salary schedule replaced and rescinded the previous year’s salary schedule, we conclude that Dr. Bivens was not required to specifically propose the rescission of the longevity-pay increases.
LCEA and LCESPO next argue that the longevity pay was incentive pay that existed separate and apart from the salary schedule and, therefore, they argue, it could not be rescinded by the adoption of the state salary matrix. As support for this argument, LCEA and LCESPO point to the fact that certain employees of the Board were paid the longevity increases regardless of their step on the salary schedule. We disagree. The evidence in the record indicates that the longevity increases did not exist “independent of’ or “on top of’ the salary schedules. Swan-ner’s testimony was very clear that when the Board adopted the longevity increases, the Board placed those raises in the salary schedules and adopted those salary schedules for the following years. There was no evidence presented indicating that the longevity pay existed separate and apart from the salary schedules. Further, LCEA’s and LCESPO’s reliance upon the fact that certain employees received the longevity-pay increases regardless of their step on the salary schedule as evidence that the longevity pay existed independent of the salary schedules is unpersuasive. The record indicates that there were certain employees with experience in both certified and noncertified positions. Those employees were identified by the Board and credited for their combined years of service in both the certified and noncertified positions and were paid the longevity increases regardless of the step they occupied on the salary schedule in their current position. We cannot conclude that the longevity pay existed separate and apart from the salary schedules based on the Board’s treatment of those few employees.
AFFIRMED.
CRAWLEY, THOMPSON, PITTMAN, and MURDOCK, JJ., concur.

. Section 16-1-30, Ala.Code 1975, which became effective on July 1, 1995, replaced § 16-8-10, Ala.Code 1975.

. LCEA is an affiliate of the AEA. Dr. Bivens testified that it was his general understanding that Jimmar was the spokesman for both LCEA's and LCESPO’s members with regard to salary and compensation issues.